BOARD OF EDUCATION OF THE WESTSIDE COMMU-
NITY SCHOOLS (DIST. 66) ET AL. *v.* MERGENS,
BY AND THROUGH HER NEXT FRIEND,
MERGENS, ET AL.

No. 88–1597.   Argued January 9, 1990—Decided June 4, 1990

228

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, and II–C, in which REHNQUIST, C. J., and WHITE, BLACKMUN, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part III, in which REHNQUIST, C. J., and WHITE and BLACKMUN, JJ., joined. KENNEDY, J., filed an opinion

concurring in part and concurring in the judgment, in which SCALIA, J., joined, *post*, p. 258. MARSHALL, J., filed an opinion concurring in the judgment, in which BRENNAN, J., joined, *post*, p. 262. STEVENS, J., filed a dissenting opinion, *post*, p. 270.

*Allen E. Daubman* argued the cause for petitioners. With him on the briefs were *Verne Moore, Jr., Marc D. Stern,* and *Amy Adelson.*

*Jay Alan Sekulow* argued the cause for private respondents. With him on the brief were *Douglas W. Davis, Robert K. Skolrood, Douglas Veith,* and *Charles E. Rice. Solicitor General Starr* argued the cause for the United States. With him on the brief were *Acting Assistant Attorney General Schiffer, Deputy Solicitor General Roberts,* and *Anthony J. Steinmeyer.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Jewish Committee et al. by *Samuel Rabinove, Richard T. Foltin,* and *Lee Boothby;* for People for the American Way by *William R. Weissman, David W. Danner,* and *Susan M. Liss;* for the Anti-Defamation League of B'nai B'rith et al. by *Richard E. Shevitz, Ruti G. Teitel, Meyer Eisenberg, Jeffrey P. Sinensky, Steven M. Freeman,* and *Jill L. Kahn;* and for the National School Boards Association by *Gwendolyn H. Gregory, August W. Steinhilber,* and *Thomas A. Shannon.*

Briefs of *amici curiae* urging affirmance were filed for the Baptist Joint Committee on Public Affairs et al. by *Douglas Laycock, Samuel E. Ericsson, Forest D. Montgomery, Oliver S. Thomas, J. Brent Walker,* and *Wilford W. Kirton, Jr.;* for the Catholic League for Religious and Civil Rights by *Nancy J. Gannon;* for Concerned Women for America by *Jordan W. Lorence, Cimron Campbell,* and *Wendell R. Bird;* for Christian Advocates Serving Evangelism by *Wendell R. Bird;* for the Knights of Columbus by *Kevin T. Baine* and *Kevin J. Hasson;* for the Rutherford Institute et al. by *John W. Whitehead;* for the Southern Center for Law & Ethics by *Albert L. Jordan;* for the United States Catholic Conference by *Mark E. Chopko* and *John A. Liekweg;* for Tara Lynn Burr et al. by *Michael W. McConnell, Robert Hale, Michael J. Woodruff, Kimberlee W. Colby, Edward McGlynn Gaffney, Jr., Thomas C. Hill, Robert J. Cynkar,* and *David L. White;* for *Richard Collin Mangrum,* pro se; and for Dr. David Moshman by *Andrew J. Ekonomou.*

Briefs of *amici curiae* were filed for the Campus Crusade for Christ, Inc., by *Robert R. Thompson;* and for Specialty Research Associates, Inc., by *Thomas Patrick Monaghan.*

JUSTICE O'CONNOR delivered the opinion of the Court, except as to Part III.

This case requires us to decide whether the Equal Access Act, 98 Stat. 1302, 20 U. S. C. §§ 4071–4074, prohibits Westside High School from denying a student religious group permission to meet on school premises during noninstructional time, and if so, whether the Act, so construed, violates the Establishment Clause of the First Amendment.

I

Respondents are current and former students at Westside High School, a public secondary school in Omaha, Nebraska. At the time this suit was filed, the school enrolled about 1,450 students and included grades 10 to 12; in the 1987–1988 school year, ninth graders were added. Westside High School is part of the Westside Community Schools system, an independent public school district. Petitioners are the Board of Education of Westside Community Schools (District 66); Wayne W. Meier, the president of the school board; James E. Findley, the principal of Westside High School; Kenneth K. Hanson, the superintendent of schools for the school district; and James A. Tangdell, the associate superintendent of schools for the school district.

Students at Westside High School are permitted to join various student groups and clubs, all of which meet after school hours on school premises. The students may choose from approximately 30 recognized groups on a voluntary basis. A list of student groups, together with a brief description of each provided by the school, appears in the Appendix to this opinion.

School Board Policy 5610 concerning "Student Clubs and Organizations" recognizes these student clubs as a "vital part of the total education program as a means of developing citizenship, wholesome attitudes, good human relations, knowledge and skills." App. 488. Board Policy 5610 also provides that each club shall have faculty sponsorship and that

"clubs and organizations shall not be sponsored by any political or religious organization, or by any organization which denies membership on the basis of race, color, creed, sex or political belief." App. 488. Board Policy 6180 on "Recognition of Religious Beliefs and Customs" requires that "[s]tudents adhering to a specific set of religious beliefs or holding to little or no belief shall be alike respected." App. 462. In addition, Board Policy 5450 recognizes its students' "Freedom of Expression," consistent with the authority of the board. App. 489.

There is no written school board policy concerning the formation of student clubs. Rather, students wishing to form a club present their request to a school official who determines whether the proposed club's goals and objectives are consistent with school board policies and with the school district's "Mission and Goals"—a broadly worded "blueprint" that expresses the district's commitment to teaching academic, physical, civic, and personal skills and values. *Id.*, at 473–478.

In January 1985, respondent Bridget Mergens met with Westside's Principal, Dr. Findley, and requested permission to form a Christian club at the school. The proposed club would have the same privileges and meet on the same terms and conditions as other Westside student groups, except that the proposed club would not have a faculty sponsor. According to the students' testimony at trial, the club's purpose would have been, among other things, to permit the students to read and discuss the Bible, to have fellowship, and to pray together. Membership would have been voluntary and open to all students regardless of religious affiliation.

Findley denied the request, as did Associate Superintendent Tangdell. In February 1985, Findley and Tangdell informed Mergens that they had discussed the matter with Superintendent Hanson and that he had agreed that her request should be denied. The school officials explained that school policy required all student clubs to have a faculty sponsor,

which the proposed religious club would not or could‛ not have, and that a religious club at the school would violate the Establishment Clause. In March 1985, Mergens appealed the denial of her request to the board of education, but the board voted to uphold the denial.

Respondents, by and through their parents as next friends, then brought this suit in the United States District Court for the District of Nebraska seeking declaratory and injunctive relief. They alleged that petitioners' refusal to permit the proposed club to meet at Westside violated the Equal Access Act, 20 U. S. C. §§ 4071–4074, which prohibits public secondary schools that receive federal financial assistance and that maintain a "limited open forum" from denying "equal access" to students who wish to meet within the forum on the basis of the content of the speech at such meetings, §4071(a). Respondents further alleged that petitioners' actions denied them their First and Fourteenth Amendment rights to freedom of speech, association, and the free exercise of religion. Petitioners responded. that the Equal Access Act did not apply to Westside and that, if the Act did apply, it violated the Establishment Clause of the First Amendment and was therefore unconstitutional. The United States intervened in the action pursuant to 28 U. S. C. § 2403 to defend the constitutionality of the Act.

The District Court entered judgment for petitioners. The court held that the Act did not apply in this case because Westside did not have a "limited open forum" as defined by the Act—all of Westside's student clubs, the court concluded, were curriculum-related and tied to the educational function of the school. The court rejected respondents' constitutional claims, reasoning that Westside did not have a limited public forum as set forth in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), and that Westside's denial of respondents' request was reasonably related to legitimate pedagogical concerns, see *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 273 (1988).

The United States Court of Appeals for the Eighth Circuit reversed. 867 F. 2d 1076 (1989). The Court of Appeals held that the District Court erred in concluding that all the existing student clubs at Westside were curriculum related. The Court of Appeals noted that the "broad interpretation" advanced by the Westside school officials "would make the [Equal Access Act] meaningless" and would allow any school to "arbitrarily deny access to school facilities to any unfavored student club on the basis of its speech content," which was "exactly the result that Congress sought to prohibit by enacting the [Act]." *Id.*, at 1078. The Court of Appeals instead found that "[m]any of the student clubs at WHS, including the chess club, are noncurriculum-related." *Id.*, at 1079. Accordingly, because it found that Westside maintained a limited open forum under the Act, the Court of Appeals concluded that the Act applied to "forbi[d] discrimination against [respondents'] proposed club on the basis of its religious content." *Ibid.*

The Court of Appeals then rejected petitioners' contention that the Act violated the Establishment Clause. Noting that the Act extended the decision in *Widmar* v. *Vincent, supra,* to public secondary schools, the Court of Appeals concluded that "[a]ny constitutional attack on the [Act] must therefore be predicated on the difference between secondary school students and university students." 867 F. 2d, at 1080 (footnote omitted). Because "Congress considered the difference in the maturity level of secondary students and university students before passing the [Act]," the Court of Appeals held, on the basis of Congress' factfinding, that the Act did not violate the Establishment Clause. *Ibid.*

We granted certiorari, 492 U. S. 917 (1989), and now affirm.

II

A

In *Widmar* v. *Vincent, supra,* we invalidated, on free speech grounds, a state university regulation that prohibited

student use of school facilities "'for purposes of religious worship or religious teaching.'" *Id.*, at 265. In doing so, we held that an "equal access" policy would not violate the Establishment Clause under our decision in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971). In particular, we held that such a policy would have a secular purpose, would not have the primary effect of advancing religion, and would not result in excessive entanglement between government and religion. *Widmar*, 454 U. S., at 271–274. We noted, however, that "[u]niversity students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion." *Id.*, at 274, n. 14.

In 1984, Congress extended the reasoning of *Widmar* to public secondary schools. Under the Equal Access Act, a public secondary school with a "limited open forum" is prohibited from discriminating against students who wish to conduct a meeting within that forum on the basis of the "religious, political, philosophical, or other content of the speech at such meetings." 20 U. S. C. §§ 4071(a) and (b). Specifically, the Act provides:

> "It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." § 4071(a).

A "limited open forum" exists whenever a public secondary school "grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." § 4071(b). "Meeting" is defined to include "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." § 4072(3).

"Noninstructional time" is defined to mean "time set aside by the school before actual classroom instruction begins or after actual classroom instruction ends." § 4072(4). Thus, even if a public secondary school allows only one "noncurriculum related student group" to meet, the Act's obligations are triggered and the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time.

The Act further specifies that a school "shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum" if the school uniformly provides that the meetings are voluntary and student initiated; are not sponsored by the school, the government, or its agents or employees; do not materially and substantially interfere with the orderly conduct of educational activities within the school; and are not directed, controlled, conducted, or regularly attended by "nonschool persons." §§ 4071(c)(1), (2), (4), and (5). "Sponsorship" is defined to mean "the act of promoting, leading, or participating in a meeting. The assignment of a teacher, administrator, or other school employee to a meeting for custodial purposes does not constitute sponsorship of the meeting." § 4072(2). If the meetings are religious, employees or agents of the school or government may attend only in a "nonparticipatory capacity." § 4071(c)(3). Moreover, a State may not influence the form of any religious activity, require any person to participate in such activity, or compel any school agent or employee to attend a meeting if the content of the speech at the meeting is contrary to that person's beliefs. §§ 4071 (d)(1), (2), and (4).

Finally, the Act does not "authorize the United States to deny or withhold Federal financial assistance to any school," § 4071(e), or "limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to

assure that attendance of students at meetings is voluntary," § 4071(f).

## B

The parties agree that Westside High School receives federal financial assistance and is a public secondary school within the meaning of the Act. App. 57–58. The Act's obligation to grant equal access to student groups is therefore triggered if Westside maintains a "limited open forum"— *i. e.*, if it permits one or more "noncurriculum related student groups" to meet on campus before or after classes.

Unfortunately, the Act does not define the crucial phrase "noncurriculum related student group." Our immediate task is therefore one of statutory interpretation. We begin, of course, with the language of the statute. See, *e. g.*, *Mallard* v. *United States District Court, Southern District of Iowa*, 490 U. S. 296, 300 (1989); *United States* v. *James*, 478 U. S. 597, 604 (1986). The common meaning of the term "curriculum" is "the whole body of courses offered by an educational institution or one of its branches." Webster's Third New International Dictionary 557 (1976); see also Black's Law Dictionary 345 (5th ed. 1979) ("The set of studies or courses for a particular period, designated by a school or branch of a school"). Cf. *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S., at 271 (high school newspaper produced as part of the school's journalism class was part of the curriculum). Any sensible interpretation of "noncurriculum related student group" must therefore be anchored in the notion that such student groups are those that are not related to the body of courses offered by the school. The difficult question is the degree of "unrelatedness to the curriculum" required for a group to be considered "noncurriculum related."

The Act's definition of the sort of "meeting[s]" that must be accommodated under the statute, § 4071(a), sheds some light on this question. "The term 'meeting' includes those activities of student groups which are . . . not *directly related* to the school curriculum." § 4072(3) (emphasis added). Con-

gress' use of the phrase "directly related" implies that student groups directly related to the subject matter of courses offered by the school do not fall within the "noncurriculum related" category and would therefore be considered "curriculum related."

The logic of the Act also supports this view, namely, that a curriculum-related student group is one that has more than just a tangential or attenuated relationship to courses offered by the school. Because the purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other noncurriculum-related student groups on the other, the Act is premised on the notion that a religious or political club is itself likely to be a noncurriculum-related student group. It follows, then, that a student group that is "curriculum related" must at least have a more direct relationship to the curriculum than a religious or political club would have.

Although the phrase "noncurriculum related student group" nevertheless remains sufficiently ambiguous that we might normally resort to legislative history, see, *e. g., James, supra,* at 606, we find the legislative history on this issue less than helpful. Because the bill that led to the Act was extensively rewritten in a series of multilateral negotiations after it was passed by the House and reported out of committee by the Senate, the Committee Reports shed no light on the language actually adopted. During congressional debate on the subject, legislators referred to a number of different definitions, and thus both petitioners and respondents can cite to legislative history favoring their interpretation of the phrase. Compare 130 Cong. Rec. 19223 (1984) (statement of Sen. Hatfield) (curriculum-related clubs are those that are "really a kind of extension of the classroom"), with *ibid.* (statement of Sen. Hatfield) (in response to question whether school districts would have full authority to decide what was curriculum related, "[w]e in no way seek to limit that discretion"). See Laycock, Equal Access and Moments of Silence: The Equal

Status of Religious Speech by Private Speakers, 81 Nw. U. L. Rev. 1, 37–39 (1986).

We think it significant, however, that the Act, which was passed by wide, bipartisan majorities in both the House and the Senate, reflects at least some consensus on a broad legislative purpose. The Committee Reports indicate that the Act was intended to address perceived widespread discrimination against religious speech in public schools, see H. R. Rep. No. 98–710, p. 4 (1984); S. Rep. No. 98–357, pp. 10–11 (1984), and, as the language of the Act indicates, its sponsors contemplated that the Act would do more than merely validate the status quo. The Committee Reports also show that the Act was enacted in part in response to two federal appellate court decisions holding that student religious groups could not, consistent with the Establishment Clause, meet on school premises during noninstructional time. See H. R. Rep. No. 98–710, *supra*, at 3–6 (discussing *Lubbock Civil Liberties Union* v. *Lubbock Independent School Dist.*, 669 F. 2d 1038, 1042–1048 (CA5 1982), cert. denied, 459 U. S. 1155–1156 (1983), and *Brandon* v. *Guilderland Bd. of Ed.*, 635 F. 2d 971 (CA2 1980), cert. denied, 454 U. S. 1123 (1981)); S. Rep. No. 98–357, *supra*, at 6–9, 11–14 (same). A broad reading of the Act would be consistent with the views of those who sought to end discrimination by allowing students to meet and discuss religion before and after classes.

In light of this legislative purpose, we think that the term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not *directly* relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic

credit. We think this limited definition of groups that directly relate to the curriculum is a commonsense interpretation of the Act that is consistent with Congress' intent to provide a low threshold for triggering the Act's requirements.

For example, a French club would directly relate to the curriculum if a school taught French in a regularly offered course or planned to teach the subject in the near future. A school's student government would generally relate directly to the curriculum to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school. If participation in a school's band or orchestra were required for the band or orchestra classes, or resulted in academic credit, then those groups would also directly relate to the curriculum. The existence of such groups at a school would not trigger the Act's obligations.

On the other hand, unless a school could show that groups such as a chess club, a stamp collecting club, or a community service club fell within our description of groups that directly relate to the curriculum, such groups would be "noncurriculum related student groups" for purposes of the Act. The existence of such groups would create a "limited open forum" under the Act and would prohibit the school from denying equal access to any other student group on the basis of the content of that group's speech. Whether a specific student group is a "noncurriculum related student group" will therefore depend on a particular school's curriculum, but such determinations would be subject to factual findings well within the competence of trial courts to make.

Petitioners contend that our reading of the Act unduly hinders local control over schools and school activities, but we think that schools and school districts nevertheless retain a significant measure of authority over the type of officially recognized activities in which their students participate. See, e. g., *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988); *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S.

675 (1986). First, schools and school districts maintain their traditional latitude to determine appropriate subjects of instruction. To the extent that a school chooses to structure its course offerings and existing student groups to avoid the Act's obligations, that result is not prohibited by the Act. On matters of statutory interpretation, "[o]ur task is to apply the text, not to improve on it." *Pavelic & LeFlore* v. *Marvel Entertainment Group*, 493 U. S. 120, 126 (1989). Second, the Act expressly does not limit a school's authority to prohibit meetings that would "materially and substantially interfere with the orderly conduct of educational activities within the school." § 4071(c)(4); cf. *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 509 (1969). The Act also preserves "the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." § 4071(f). Finally, because the Act applies only to public secondary schools that receive federal financial assistance, § 4071(a), a school district seeking to escape the statute's obligations could simply forgo federal funding. Although we do not doubt that in some cases this may be an unrealistic option, Congress clearly sought to prohibit schools from discriminating on the basis of the content of a student group's speech, and that obligation is the price a federally funded school must pay if it opens its facilities to noncurriculum-related student groups.

The dissent suggests that "an extracurricular student organization is 'noncurriculum related' if it has as its purpose (or as part of its purpose) the advocacy of partisan theological, political, or ethical views." *Post*, at 276; see also *post*, at 271, 290 (Act is triggered only if school permits "controversial" or "distasteful" groups to use its facilities); *post*, at 291 ("noncurriculum" subjects are those that " 'cannot properly be included in a public school curriculum' "). This interpretation of the Act, we are told, is mandated by Congress' intention to

"track our own Free Speech Clause jurisprudence," *post*, at 279, n. 10, by incorporating *Widmar's* notion of a "limited public forum" into the language of the Act. *Post*, at 271–272.

This suggestion is flawed for at least two reasons. First, the Act itself neither uses the phrase "limited public forum" nor so much as hints that that doctrine is somehow "incorporated" into the words of the statute. The operative language of the statute, 20 U. S. C. § 4071(a), of course, refers to a "limited open forum," a term that is specifically defined in the next subsection, § 4071(b). Congress was presumably aware that "limited public forum," as used by the Court, is a term of art, see, *e. g., Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–49 (1983), and had it intended to import that concept into the Act, one would suppose that it would have done so explicitly. Indeed, Congress' deliberate choice to use a different term — and to define that term — can only mean that it intended to establish a standard different from the one established by our free speech cases. See Laycock, 81 Nw. U. L. Rev., at 36 ("The statutory 'limited open forum' is an artificial construct, and comparisons with the constitutional ['limited public forum'] cases can be misleading"). To paraphrase the dissent, "[i]f Congress really intended to [incorporate] *Widmar* for reasons of administrative clarity, Congress kept its intent well hidden, both in the statute and in the debates preceding its passage." *Post*, at 281–282, n. 15.

Second, and more significant, the dissent's reliance on the legislative history to support its interpretation of the Act shows just how treacherous that task can be. The dissent appears to agree with our view that the legislative history of the Act, even if relevant, is highly unreliable, see, *e. g., post*, at 274–275, n. 5, and 281–282, n. 15, yet the interpretation it suggests rests solely on a few passing, general references by legislators to our decision in *Widmar*, see *post*, at 274, and n. 4. We think that reliance on legislative history is hazardous at best, but where "'not even the sponsors of the bill

knew what it meant,'" *post*, at 281, n. 15 (quoting Laycock, *supra*, at 38 (citation omitted)), such reliance cannot form a reasonable basis on which to interpret the text of a statute. For example, the dissent appears to place great reliance on a comment by Senator Levin that the Act extends the rule in *Widmar* to secondary schools, see *post*, at 274, n. 4, but Senator Levin's understanding of the "rule," expressed in the same breath as the statement on which the dissent relies, fails to support the dissent's reading of the Act. See 130 Cong. Rec. 19236 (1984) ("The pending amendment will allow students equal access to secondary schools student-initiated religious meetings before and after school where the school *generally* allows groups of secondary school students to meet during those times") (emphasis added). Moreover, a number of Senators, during the same debate, warned that some of the views stated did not reflect their own views. See, *e. g.*, *ibid.* ("I am troubled with the legislative history that you are making here") (statement of Sen. Chiles); *id.*, at 19237 ("[T]here have been a number of statements made on the floor today which may be construed as legislative history modifying what my understanding was or what anyone's understanding might be of this bill") (statement of Sen. Denton). The only thing that can be said with any confidence is that *some* Senators *may* have thought that the obligations of the Act would be triggered only when a school permits advocacy groups to meet on school premises during noninstructional time. That conclusion, of course, cannot bear the weight the dissent places on it.

## C

The parties in this case focus their dispute on 10 of Westside's approximately 30 voluntary student clubs: Interact (a service club related to Rotary International); Chess Club; Subsurfers (a club for students interested in scuba diving); National Honor Society; Photography Club; Welcome to Westside Club (a club to introduce new students to the

school); Future Business Leaders of America; Zonta Club (the female counterpart to Interact); Student Advisory Board (student government); and Student Forum (student government). App. 60. Petitioners contend that all of these student activities are curriculum related because they further the goals of particular aspects of the school's curriculum. The Welcome to Westside Club, for example, helps "further the School's overall goal of developing effective citizens by requiring student members to contribute to their fellow students." Brief for Petitioners 16. The student government clubs "advance the goals of the School's political science classes by providing an understanding and appreciation of government processes." *Id.*, at 17. Subsurfers furthers "one of the essential goals of the Physical Education Department—enabling students to develop life-long recreational interests." *Id.*, at 18. The Chess Club "supplement[s] math and science courses because it enhances students' ability to engage in critical thought processes." *Id.*, at 18–19. Participation in Interact and the Zonta Club "promotes effective citizenship, a critical goal of the WHS curriculum, specifically the Social Studies Department." *Id.*, at 19.

To the extent that petitioners contend that "curriculum related" means anything remotely related to abstract educational goals, however, we reject that argument. To define "curriculum related" in a way that results in almost no schools having limited open fora, or in a way that permits schools to evade the Act by strategically describing existing student groups, would render the Act merely hortatory. See 130 Cong. Rec. 19222 (1984) (statement of Sen. Leahy) ("[A] limited open forum should be triggered by what a school does, not by what it says"). As the court below explained:

"Allowing such a broad interpretation of 'curriculum-related' would make the [Act] meaningless. A school's administration could simply declare that it maintains a closed forum and choose which student clubs it wanted to allow by tying the purposes of those student clubs to

> some broadly defined educational goal. At the same time the administration could arbitrarily deny access to school facilities to any unfavored student club on the basis of its speech content. This is exactly the result that Congress sought to prohibit by enacting the [Act]. A public secondary school cannot simply declare that it maintains a closed forum and then discriminate against a particular student group on the basis of the content of the speech of that group." 867 F. 2d, at 1078.

See also *Garnett* v. *Renton School Dist. No. 403*, 874 F. 2d 608, 614 (CA9 1989) ("Complete deference [to the school district] would render the Act meaningless because school boards could circumvent the Act's requirements simply by asserting that all student groups are curriculum related").

Rather, we think it clear that Westside's existing student groups include one or more "noncurriculum related student groups." Although Westside's physical education classes apparently include swimming, see Record, Tr. of Preliminary Injunction Hearing 25, counsel stated at oral argument that scuba diving is not taught in any regularly offered course at the school, Tr. of Oral Arg. 6. Based on Westside's own description of the group, Subsurfers does not directly relate to the curriculum as a whole in the same way that a student government or similar group might. App. 485–486. Moreover, participation in Subsurfers is not required by any course at the school and does not result in extra academic credit. *Id.*, at 170–171, 236. Thus, Subsurfers is a "noncurriculum related student group" for purposes of the Act. Similarly, although math teachers at Westside have encouraged their students to play chess, *id.*, at 442–444, chess is not taught in any regularly offered course at the school, Tr. of Oral Arg. 6, and participation in the Chess Club is not required for any class and does not result in extra credit for any class, App. 302–304. The Chess Club is therefore another "noncurriculum related student group" at

Westside. Moreover, Westside's principal acknowledged at trial that the Peer Advocates program—a service group that works with special education classes—does not directly relate to any courses offered by the school and is not required by any courses offered by the school. *Id.*, at 231–233; see also *id.*, at 198–199 (participation in Peer Advocates is not required for any course and does not result in extra credit in any course). Peer Advocates would therefore also fit within our description of a "noncurriculum related student group." The record therefore supports a finding that Westside has maintained a limited open forum under the Act.

Although our definition of "noncurriculum related student activities" looks to a school's actual practice rather than its stated policy, we note that our conclusion is also supported by the school's own description of its student activities. As reprinted in the Appendix to this opinion, the school states that Band "is included in our regular curriculum"; Choir "is a course offered as part of the curriculum"; Distributive Education "is an extension of the Distributive Education class"; International Club is "developed through our foreign language classes"; Latin Club is "designed for those students who are taking Latin as a foreign language"; Student Publications "includes classes offered in preparation of the yearbook (Shield) and the student newspaper (Lance)"; Dramatics "is an extension of a regular academic class"; and Orchestra "is an extension of our regular curriculum." These descriptions constitute persuasive evidence that these student clubs directly relate to the curriculum. By inference, however, the fact that the descriptions of student activities such as Subsurfers and chess do not include such references strongly suggests that those clubs do not, by the school's own admission, directly relate to the curriculum. We therefore conclude that Westside permits "one or more noncurriculum related student groups to meet on school premises during noninstructional time," § 4071(b). Because Westside maintains a "limited open forum" under the Act, it is prohibited from

discriminating, based on the content of the students' speech, against students who wish to meet on school premises during noninstructional time.

The remaining statutory question is whether petitioners' denial of respondents' request to form a religious group constitutes a denial of "equal access" to the school's limited open forum. Although the school apparently permits respondents to meet informally after school, App. 315–316, respondents seek equal access in the form of official recognition by the school. Official recognition allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair. *Id.*, at 434–435. Given that the Act explicitly prohibits denial of "equal access . . . to . . . any students who wish to conduct a meeting within [the school's] limited open forum" on the basis of the religious content of the speech at such meetings, § 4071(a), we hold that Westside's denial of respondents' request to form a Christian club denies them "equal access" under the Act.

Because we rest our conclusion on statutory grounds, we need not decide—and therefore express no opinion on— whether the First Amendment requires the same result.

## III

Petitioners contend that even if Westside has created a limited open forum within the meaning of the Act, its denial of official recognition to the proposed Christian club must nevertheless stand because the Act violates the Establishment Clause of the First Amendment, as applied to the States through the Fourteenth Amendment. Specifically, petitioners maintain that because the school's recognized student activities are an integral part of its educational mission, official recognition of respondents' proposed club would effectively incorporate religious activities into the school's official program, endorse participation in the religious club, and pro-

vide the club with an official platform to proselytize other students.

We disagree. In *Widmar*, we applied the three-part *Lemon* test to hold that an "equal access" policy, at the university level, does not violate the Establishment Clause. See 454 U. S., at 271–275 (applying *Lemon*, 403 U. S., at 612–613). We concluded that "an open-forum policy, including nondiscrimination against religious speech, would have a secular purpose," 454 U. S., at 271 (footnotes omitted), and would in fact *avoid* entanglement with religion. See *id.*, at 272, n. 11 ("[T]he University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech'"). We also found that although incidental benefits accrued to religious groups who used university facilities, this result did not amount to an establishment of religion. First, we stated that a university's forum does not "confer any imprimatur of state approval on religious sects or practices." *Id.*, at 274. Indeed, the message is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion. "The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities." *McDaniel* v. *Paty*, 435 U. S. 618, 641 (1978) (BRENNAN, J., concurring in judgment). Second, we noted that "[t]he [University's] provision of benefits to [a] broad . . . spectrum of groups"—both nonreligious and religious speakers—was "an important index of secular effect." 454 U. S., at 274.

We think the logic of *Widmar* applies with equal force to the Equal Access Act. As an initial matter, the Act's prohibition of discrimination on the basis of "political, philosophical, or other" speech as well as religious speech is a sufficient basis for meeting the secular purpose prong of the *Lemon* test. See *Edwards* v. *Aguillard*, 482 U. S. 578, 586 (1987)

(Court "is normally deferential to a [legislative] articulation of a secular purpose"); *Mueller* v. *Allen,* 463 U. S. 388, 394–395 (1983) (Court is "reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). Congress' avowed purpose— to prevent discrimination against religious and other types of speech—is undeniably secular. See *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 335–336 (1987); *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 773 (1973). Cf. 42 U. S. C. § 2000e–2(a) (prohibiting employment discrimination on grounds of race, color, religion, sex, or national origin). Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law. Because the Act on its face grants equal access to both secular and religious speech, we think it clear that the Act's purpose was not to "'endorse or disapprove of religion,'" *Wallace* v. *Jaffree,* 472 U. S. 38, 56 (1985) (quoting *Lynch* v. *Donnelly,* 465 U. S. 668, 690 (1984) (O'CONNOR, J., concurring)).

Petitioners' principal contention is that the Act has the primary effect of advancing religion. Specifically, petitioners urge that, because the student religious meetings are held under school aegis, and because the State's compulsory attendance laws bring the students together (and thereby provide a ready-made audience for student evangelists), an objective observer in the position of a secondary school student will perceive official school support for such religious meetings. See *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 593 (1989) (Establishment Clause inquiry is whether the government "'convey[s] or attempt[s] to convey a message that religion or

a particular religious belief is favored or preferred'") (quoting *Wallace* v. *Jaffree, supra,* at 70 (O'CONNOR, J., concurring in part and concurring in judgment)).

We disagree. First, although we have invalidated the use of public funds to pay for teaching state-required subjects at parochial schools, in part because of the risk of creating "a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school," *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 385 (1985), there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely.permits on a nondiscriminatory basis. Cf. *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503 (1969) (no danger that high school students' symbolic speech implied school endorsement); *West Virginia State Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943) (same). See generally Note, 92 Yale. L. J. 499, 507–509 (1983) (summarizing research in adolescent psychology). The proposition that schools do not endorse everything they fail to censor is not complicated. "[P]articularly in this age of massive media information . . . the few years difference in age between high school and college students [does not] justif[y] departing from *Widmar.*" *Bender* v. *Williamsport Area School Dist.,* 475 U. S. 534, 556 (1986) (Powell, J., dissenting).

Indeed, we note that Congress specifically rejected the argument that high school students are likely to confuse an equal access policy with state sponsorship of religion. See S. Rep. No. 98–357, p. 8 (1984); *id.,* at 35 ("[S]tudents below the college level are capable of distinguishing between State-initiated, school sponsored, or teacher-led religious

speech on the one hand and student-initiated, student-led religious speech on the other"). Given the deference due "the duly enacted and carefully considered decision of a coequal and representative branch of our Government," *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 319 (1985); see also *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981), we do not lightly second-guess such legislative judgments, particularly where the judgments are based in part on empirical determinations.

Second, we note that the Act expressly limits participation by school officials at meetings of student religious groups, §§ 4071(c)(2) and (3), and that any such meetings must be held during "noninstructional time," § 4071(b). The Act therefore avoids the problems of "the students' emulation of teachers as role models" and "mandatory attendance requirements," *Edwards* v. *Aguillard*, 482 U. S., at 584; see also *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign County*, 333 U. S. 203, 209–210 (1948) (release time program invalid where students were "released in part from their legal duty [to attend school] upon the condition that they attend the religious classes"). To be sure, the possibility of *student* peer pressure remains, but there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate. Moreover, petitioners' fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students. To the extent a school makes clear that its recognition of respondents' proposed club is not an endorsement of the views of the club's participants, see *Widmar*, 454 U. S., at 274, n. 14 (noting that university student handbook states that the university's name will not be identified with the aims, policies, or opinions of any student organization or its members), students will reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech.

Third, the broad spectrum of officially recognized student clubs at Westside, and the fact that Westside students are free to initiate and organize additional student clubs, see App. 221–222, counteract any possible message of official endorsement of or preference for religion or a particular religious belief. See *Widmar*, 454 U. S., at 274 ("The provision of benefits to so broad a spectrum of groups is an important index of secular effect"). Although a school may not itself lead or direct a religious club, a school that permits a student-initiated and student-led religious club to meet after school, just as it permits any other student group to do, does not convey a message of state approval or endorsement of the particular religion. Under the Act, a school with a limited open forum may not lawfully deny access to a Jewish students' club, a Young Democrats club, or a philosophy club devoted to the study of Nietzsche. To the extent that a religious club is merely one of many different student-initiated voluntary clubs, students should perceive no message of government endorsement of religion. Thus, we conclude that the Act does not, at least on its face and as applied to Westside, have the primary effect of advancing religion. See *id.*, at 275 ("At least in the absence of empirical evidence that religious groups will dominate [the university's] open forum, . . . the advancement of religion would not be the forum's 'primary effect'").

Petitioners' final argument is that by complying with the Act's requirements, the school risks excessive entanglement between government and religion. The proposed club, petitioners urge, would be required to have a faculty sponsor who would be charged with actively directing the activities of the group, guiding its leaders, and ensuring balance in the presentation of controversial ideas. Petitioners claim that this influence over the club's religious program would entangle the government in day-to-day surveillance of religion of the type forbidden by the Establishment Clause.

Under the Act, however, faculty monitors may not participate in any religious meetings, and nonschool persons may not direct, control, or regularly attend activities of student groups. §§ 4071(c)(3) and (5). Moreover, the Act prohibits school "sponsorship" of any religious meetings, § 4071(c)(2), which means that school officials may not promote, lead, or participate in any such meeting, § 4072(2). Although the Act permits "[t]he assignment of a teacher, administrator, or other school employee to a meeting for custodial purposes," *ibid.*, such custodial oversight of the student-initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in the day-to-day surveillance or administration of religious activities. See *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 305–306 (1985). Indeed, as the Court noted in *Widmar*, a denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur. See 454 U. S., at 272, n. 11.

Accordingly, we hold that the Equal Access Act does not on its face contravene the Establishment Clause. Because we hold that petitioners have violated the Act, we do not decide respondents' claims under the Free Speech and Free Exercise Clauses. For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

Plaintiff's Trial Exhibit 63

*STUDENT ACTIVITIES*

August, 1984

*BAND*—This activity is included in our regular curriculum. Extensions of this activity include Marching Band, Ensembles, Pep Band, and Concert Jazz Band. Performances,

presentations, and programs are presented throughout the school year.

*CHESS CLUB*—This activity is for those interested in playing chess. Opportunities to play are held after school throughout the school year.

*CHEERLEADERS*—A girls sport cheerleader team is made up of a junior varsity and varsity. The boys sport cheerleaders consist of sophomores, junior varsity, and varsity. Tryouts for these spirit groups are held each spring.

*CHOIR*—This is a course offered as part of the curriculum. Extensions of this class include Boys and Girls Glee, Warrior Voices, and Concert and Chamber Choirs. Membership in these activities are *[sic]* determined by enrollment and tryouts.

*CLASS OFFICERS*—Voting and selection of junior and senior class officers for the following year are held each spring. Students interested in being a class officer will need to secure support, be willing to make a presentation to their class, and serve their class in an officer capacity for the following year.

*DISTRIBUTIVE EDUCATION* (DECA)—This is an organization that is an extension of the Distributive Education class. Membership in this activity is offered to those students involved in D. E. The club for the current year is formulated at the beginning of school each fall.

*SPEECH & DEBATE*—This is an activity for students interested in participating on a competitive level in both speech and debate. The season begins the first week in November and continues through March.

*DRILL SQUAD & SQUIRES*—These are spirit groups primarily concerned with performing at half time at football and basketball games. Selection for these squads is made in the spring of each school year. These marching units are also support groups for other athletic teams.

*FUTURE BUSINESS LEADERS OF AMERICA* (FBLA)—This is a club designed for students interested in pursuing the field of business. It is open to any student with an interest. Membership begins in the fall of each school year.

*FUTURE MEDICAL ASSISTANTS* (FMA)—This is a club designed for students with an interest in pursuing any area of medicine. The organization assists in securing blood donations from individuals at Westside High School for the Red Cross. Meetings are held to inform the membership about opportunities in the medical field. Memberships are accepted at the beginning of school each fall.

*INTERACT*—This is a boys volunteer organization associated with the Rotary Club of America. Its basic function is to do volunteer work within the community. They *[sic]* are also a support and spirit group for our athletic teams. Membership is open to 11th and 12th grade boys; with membership opportunities being available in the fall of each school year.

*INTERNATIONAL CLUB*—This is a club designed to help students understand people from other countries and is developed through our foreign language classes. French, German, Spanish, and Latin teachers encourage membership in this organization in the fall of each year. Sponsorship of foreign students, who attend Westside, is one of their *[sic]* major activities.

*LATIN CLUB* (Junior Classical League)—This is a club designed for those students who are taking Latin as a foreign language. This club competes in competitive situations between schools and is involved with state competition as well. Students have the opportunity to join JCL beginning in the fall of each school year.

*MATH CLUB*—This club is for any student interested in mathematics. Meetings are held periodically during the school year.

*STUDENT PUBLICATIONS*—This activity includes classes offered in preparation of the yearbook (Shield) and the student newspaper (Lance). Opportunities to learn about journalism are provided for students interested in these areas. Membership in Quill and Scroll is an extension of a student's involvement in school publications.

*STUDENT FORUM*—Each homeroom elects one representative as a member of the student forum. Their responsibility is to provide ideas, make suggestions, and serve as one informational group to the staff and administration for student government. Selections are made for this membership in the fall of each school year.

*DRAMATICS*—This activity is an extension of a regular academic class. School plays, one-act plays, and musicals are provided for students with an interest and ability in these areas. Tryouts for these productions are announced prior to the selection of individuals for these activities.

*CREATIVE WRITING CLUB*—This is an organization that provides students, with the interest and capability, an opportunity to do prose and poetry writing. This club meets periodically throughout the year and publishes the students' work. Any student with an interest is encouraged to become a member.

*PHOTOGRAPHY CLUB*—This is a club for the student who has the interest and/or ability in photography. Students have an opportunity to take photos of school activities. A dark room is provided for the students' use. Membership in this organization begins in the fall of each school year.

*ORCHESTRA*—This activity is an extension of our regular curriculum. Performances are given periodically throughout the year. Tryouts are held for some special groups within the orchestra. All students signed up for that class have the opportunity to try out.

*OUTDOOR EDUCATION*—This activity is an opportunity for interested students to be involved in the elementary

school Outdoor Education Program. High school students are used as camp counselors and leaders for this activity. Students are solicited to help work prior to the fall and spring Outdoor Ed Program.

*SWIMMING TIMING TEAM*—Offers an interested student a chance to be a part of the Timing Team that is used during the competitive swimming season. Regular season meets, invitational meets, and the metro swim meet are swimming activities at which these volunteers will work. Membership in this group is solicited prior to the beginning of the competitive season.

*STUDENT ADVISORY BOARD* (SAB)—Is another facet of student government. Members are elected from each class to represent the student body. These elections are held at the same time class officers are elected. Any student has an opportunity to submit their name for consideration.

*INTRAMURALS*—Are offered to Westside students these following times. Basketball begins the latter part of November and continues through February. Co-educational volleyball is the spring intramural activity. Announcements are made to students so they can organize and formulate teams prior to the beginning of these activities.

*COMPETITIVE ATHLETICS*—Westside High School offers students the opportunity to try out and participate in eighteen varsity sports. Twenty-seven different competitive teams are available for students at each grade level. The seasons when these are offered and the procedures for getting involved can be found in the Warrior Bulletin that is published and distributed in August, prior to the opening of school.

*ZONTA CLUB* (Z Club)—Is a volunteer club for girls associated with Zonta International. Approximately one hundred junior and senior girls are involved in this volunteer organization. Eleventh and twelfth grade students are encouraged to join in the fall of each school year.

*SUBSURFERS*—Is a club designed for students interested in learning about skin and scuba diving and other practical applications of that sport. Opportunities in the classroom and in our pool are made available for students involved in this activity. Membership is solicited in the fall and spring of each year.

*WELCOME TO WESTSIDE CLUB*—Is an organization for students who are interested in helping students new to District 66 and to Westside High School. Activities are held for them which are geared toward helping them become a part of our school curriculum and activities.

*WRESTLING AUXILIARY*—Is for girls interested in supporting our competitive wrestling team. Membership is solicited prior to the competitive wrestling season.

*NATIONAL HONOR SOCIETY*—Westside Honor Society is a chapter of the national organization and is bound by its rules and regulations. It is open to seniors who are in the upper 15% of their class. Westside in practice and by general agreement of the local chapter has inducted only those juniors in the upper 7% of their class. The selection is made not only upon scholarship but also character, leadership, and service. A committee meets and selects those students who they believe represent the high qualities of the organization. Induction into NHS is held in the spring of each year.

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

The Court's interpretation of the statutory term "noncurriculum related groups" is proper and correct, in my view, and I join Parts I and II of the Court's opinion. I further agree that the Act does not violate the Establishment Clause, and so I concur in the judgment; but my view of the analytic premise that controls the establishment question differs from that employed by the plurality. I write to explain

why I cannot join all that is said in Part III of JUSTICE O'CONNOR's opinion.

## I

A brief initial comment on the statutory issue is in order. The student clubs recognized by Westside school officials are a far cry from the groups given official recognition by university officials in *Widmar* v. *Vincent*, 454 U. S. 263 (1981). As JUSTICE STEVENS points out in dissent, one of the consequences of the statute, as we now interpret it, is that clubs of a most controversial character might have access to the student life of high schools that in the past have given official recognition only to clubs of a more conventional kind. See *post*, at 271, 276.

It must be apparent to all that the Act has made a matter once left to the discretion of local school officials the subject of comprehensive regulation by federal law. This decision, however, was for Congress to make, subject to constitutional limitations. Congress having decided in favor of legislative intervention, it faced the task of formulating general statutory standards against the background protections of the Free Speech Clause, as well as the Establishment and Free Exercise Clauses. Given the complexities of our own jurisprudence in these areas, there is no doubt that the congressional task was a difficult one. While I cannot pretend that the language Congress used in the Act is free from ambiguity in some of its vital provisions, the Court's interpretation of the phrase "noncurriculum related" seems to me to be the most rational and indeed the most plausible interpretation available, given the words and structure of the Act and the constitutional implications of the subject it addresses.

There is one structural feature of the statute that should be noted. The opinion of the Court states that "[i]f the meetings are religious, employees or agents of the school or government may attend only in a 'nonparticipatory capacity.'" *Ante*, at 236 (quoting 20 U. S. C. § 4071(c)(3)). This is based upon a provision in the Act in which nonparticipation is one

of several statutory criteria that a school must meet in order to "be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum." § 4071(c). It is not altogether clear, however, whether satisfaction of these criteria is the sole means of meeting the statutory requirement that schools with noncurriculum related student groups provide a "fair opportunity" to religious clubs. § 4071(a). Although we need not answer it today, left open is the question whether school officials may prove that they are in compliance with the statute without satisfying all of the criteria in § 4071(c). But in the matter before us, the school has not attempted to comply with the statute through any means, and we have only to determine whether it is possible for the statute to be implemented in a constitutional manner.

## II

I agree with the plurality that a school complying with the statute by satisfying the criteria in § 4071(c) does not violate the Establishment Clause. The accommodation of religion mandated by the Act is a neutral one, and in the context of this case it suffices to inquire whether the Act violates either one of two principles. The first is that the government cannot "give direct benefits to religion in such a degree that it in fact 'establishes a [state] religion or religious faith, or tends to do so.'" *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 659 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part) (quoting *Lynch* v. *Donnelly*, 465 U. S. 668, 678 (1984)). Any incidental benefits that accompany official recognition of a religious club under the criteria set forth in the § 4071(c) do not lead to the establishment of religion under this standard. See *Widmar, supra*, at 273–274. The second principle controlling the case now before us, in my view, is that the government cannot coerce any student to participate in a religious activity. Cf. *County of Allegheny, supra*, at 659. The Act is consistent with this stand-

ard as well. Nothing on the face of the Act or in the facts of the case as here presented demonstrates that enforcement of the statute will result in the coercion of any student to participate in a religious activity. The Act does not authorize school authorities to require, or even to encourage, students to become members of a religious club or to attend a club's meetings, see §§ 4071(c), (d), 4072(2); the meetings take place while school is not in session, see §§ 4071(b), 4072(4); and the Act does not compel any school employee to participate in, or to attend, a club's meetings or activities, see §§ 4071(c), (d)(4).

The plurality uses a different test, one which asks whether school officials, by complying with the Act, have endorsed religion. It is true that when government gives impermissible assistance to a religion it can be said to have "endorsed" religion; but endorsement cannot be the test. The word endorsement has insufficient content to be dispositive. And for reasons I have explained elsewhere, see *Allegheny County, supra*, its literal application may result in neutrality in name but hostility in fact when the question is the government's proper relation to those who express some religious preference.

I should think it inevitable that a public high school "endorses" a religious club, in a commonsense use of the term, if the club happens to be one of many activities that the school permits students to choose in order to further the development of their intellect and character in an extracurricular setting. But no constitutional violation occurs if the school's action is based upon a recognition of the fact that membership in a religious club is one of many permissible ways for a student to further his or her own personal enrichment. The inquiry with respect to coercion must be whether the government imposes pressure upon a student to participate in a religious activity. This inquiry, of course, must be undertaken with sensitivity to the special circumstances that exist in a secondary school where the line between voluntary and

coerced participation may be difficult to draw. No such coercion, however, has been shown to exist as a necessary result of this statute, either on its face or as respondents seek to invoke it on the facts of this case.

For these reasons, I join Parts I and II of the Court's opinion and concur in the judgment.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, concurring in the judgment.

I agree with the majority that "noncurriculum" must be construed broadly to "prohibit schools from discriminating on the basis of the content of a student group's speech." *Ante,* at 241. As the majority demonstrates, such a construction "is consistent with Congress' intent to provide a low threshold for triggering the Act's requirements." *Ante,* at 240. In addition, to the extent that Congress intended the Act to track this Court's free speech jurisprudence, as the dissent argues, *post,* at 279, n. 10, the majority's construction is faithful to our commitment to nondiscriminatory access to open fora in public schools. *Widmar* v. *Vincent,* 454 U. S. 263, 267 (1981). When a school allows student-initiated clubs not directly tied to the school's curriculum to use school facilities, it has "created a forum generally open to student groups" and is therefore constitutionally prohibited from enforcing a "content-based exclusion" of other student speech. *Id.,* at 277. In this respect, the Act as construed by the majority simply codifies in statute what is already constitutionally mandated: schools may not discriminate among student-initiated groups that seek access to school facilities for expressive purposes not directly related to the school's curriculum.

The Act's low threshold for triggering equal access, however, raises serious Establishment Clause concerns where secondary schools with fora that differ substantially from the forum in *Widmar* are required to grant access to student religious groups. Indeed, as applied in the present case, the Act mandates a religious group's access to a forum that is dedicated to promoting fundamental values and citizenship as

defined by the school. The Establishment Clause does not forbid the operation of the Act in such circumstances, but it does require schools to change their relationship to their fora so as to disassociate themselves effectively from religious clubs' speech. Thus, although I agree with the plurality that the Act as applied to Westside *could* withstand Establishment Clause scrutiny, *ante*, at 247–253 (O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE and BLACKMUN, JJ.), I write separately to emphasize the steps Westside must take to avoid appearing to endorse the Christian club's goals. The plurality's Establishment Clause analysis pays inadequate attention to the differences between this case and *Widmar* and dismisses too lightly the distinctive pressures created by Westside's highly structured environment.

## I

### A

This case involves the intersection of two First Amendment guarantees—the Free Speech Clause and the Establishment Clause. We have long regarded free and open debate over matters of controversy as necessary to the functioning of our constitutional system. See, *e. g.*, *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 ((1972) ("To permit the continued building of our politics and culture, and to assure self-fulfillment for each individual, our people are guaranteed the right to express any thought, free from government censorship"). That the Constitution requires toleration of speech over its suppression is no less true in our Nation's schools. See *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 512 (1969); *Keyishian* v. *Board of Regents of Univ. of N. Y.*, 385 U. S. 589, 603 (1967); *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 280–281 (1988) (BRENNAN, J., dissenting).

But the Constitution also demands that the State not take action that has the primary effect of advancing religion. See, *e. g.*, *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971).

The introduction of religious speech into the public schools reveals the tension between these two constitutional commitments, because the failure of a school to stand apart from religious speech can convey a message that the school endorses rather than merely tolerates that speech. Recognizing the potential dangers of school-endorsed religious practice, we have shown particular "vigilan[ce] in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards* v. *Aguillard*, 482 U. S. 578, 583–584 (1987). See also *Wallace* v. *Jaffree*, 472 U. S. 38, 40 (1985) (invalidating statute authorizing a moment of silence in public schools for meditation or voluntary prayer); *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign County*, 333 U. S. 203 (1948) (invalidating statute providing for voluntary religious education in the public schools). This vigilance must extend to our monitoring of the actual effects of an "equal access" policy. If public schools are perceived as conferring the *imprimatur* of the State on religious doctrine or practice as a result of such a policy, the nominally "neutral" character of the policy will not save it from running afoul of the Establishment Clause.*

B

We addressed at length the potential conflict between toleration and endorsement of religious speech in *Widmar*. There, a religious study group sought the same access to university facilities that the university afforded to over 100

---

*As a majority of this Court today holds, see *ante*, at 249–250 (O'CONNOR, J., joined by REHNQUIST, C. J., and WHITE and BLACKMUN, JJ.); *infra*, at 270, the Establishment Clause proscribes public schools from "conveying a message 'that religion or a particular religious belief is favored or preferred,'" *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 627 (1989) (quoting *Wallace* v. *Jaffree*, 472 U. S. 38, 70 (1985) (O'CONNOR, J., concurring in part and concurring in judgment)), even if such schools do not actually "impos[e] pressure upon a student to participate in a religious activity," *ante*, at 261 (KENNEDY, J., concurring in part and concurring in judgment).

officially recognized student groups, including many political organizations. In those circumstances, we concluded that granting religious organizations similar access to the public forum would have neither the purpose nor the primary effect of advancing religion. 454 U. S., at 270–275. The plurality suggests that our conclusion in *Widmar* controls this case. *Ante,* at 248–253. But the plurality fails to recognize that the wide-open and independent character of the student forum in *Widmar* differs substantially from the forum at Westside.

Westside currently does not recognize any student club that advocates a controversial viewpoint. Indeed, the clubs at Westside that trigger the Act involve scuba diving, chess, and counseling for special education students. *Ante,* at 245–246. As a matter of school policy, Westside encourages student participation in clubs based on a broad conception of its educational mission. See App. 488; *ante,* at 231. That mission comports with the Court's acknowledgment "that public schools are vitally important 'in the preparation of individuals for participation as citizens,' and as vehicles for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" *Board of Education, Island Trees Union Free School Dist. No. 26* v. *Pico,* 457 U. S. 853, 864 (1982) (plurality) (quoting *Ambach* v. *Norwick,* 441 U. S. 68, 76–77 (1979)). Given the nature and function of student clubs at Westside, the school makes no effort to disassociate itself from the activities and goals of its student clubs.

The entry of religious clubs into such a realm poses a real danger that those clubs will be viewed as part of the school's effort to inculcate fundamental values. The school's message with respect to its existing clubs is not one of toleration but one of endorsement. As the majority concedes, the program is part of the "district's commitment to teaching academic, physical, civic, and personal skills and values." *Ante,* at 232. But although a school may permissibly encourage its students to become well rounded as student-athletes, student-musicians, and student-tutors, the Constitution for-

bids schools to encourage students to become well rounded as student-worshippers. Neutrality towards religion, as required by the Constitution, is not advanced by requiring a school that endorses the goals of some noncontroversial secular organizations to endorse the goals of religious organizations as well.

The fact that the Act, when triggered, provides access to political as well as religious speech does not ameliorate the potential threat of endorsement. The breadth of beneficiaries under the Act does suggest that the Act may satisfy the "secular purpose" requirement of the Establishment Clause inquiry we identified in *Lemon, supra,* at 612–613. But see *post,* at 284–285, n. 20 (STEVENS, J., dissenting). But the crucial question is how the Act affects each school. If a school already houses numerous ideological organizations, then the addition of a religion club will most likely not violate the Establishment Clause because the risk that students will erroneously attribute the views of the religion club to the school is minimal. To the extent a school tolerates speech by a wide range of ideological clubs, students cannot reasonably understand the school to endorse all of the groups' divergent and contradictory views. But if the religion club is the sole advocacy-oriented group in the forum, or one of a very limited number, and the school continues to promote its student-club program as instrumental to citizenship, then the school's failure to disassociate itself from the religious activity will reasonably be understood as an endorsement of that activity. That political and other advocacy-oriented groups are permitted to participate in a forum that, through school support and encouragement, is devoted to fostering a student's civic identity does not ameliorate the appearance of school endorsement unless the invitation is accepted and the forum is transformed into a forum like that in *Widmar.*

For this reason, the plurality's reliance on *Widmar* is misplaced. The University of Missouri took concrete steps to ensure "that the University's name will not 'be identified in

any way with the aims, policies, programs, products, or opinions of any organization or its members,'" 454 U. S., at 274, n. 14 (quoting University of Missouri student handbook). Westside, in contrast, explicitly promotes its student clubs "as a vital part of the total education program [and] as a means of developing citizenship." App. 488. And while the University of Missouri recognized such clubs as the Young Socialist Alliance and the Young Democrats, *Chess* v. *Widmar*, 635 F. 2d 1310, 1312, n. 1, (CA8 1980), Westside has recognized no such political clubs, App. 488.

The different approaches to student clubs embodied in these policies reflect a significant difference, for Establishment Clause purposes, between the respective roles that Westside High School and the University of Missouri attempt to play in their students' lives. To the extent that a school emphasizes the autonomy of its students, as does the University of Missouri, there is a corresponding decrease in the likelihood that student speech will be regarded as school speech. Conversely, where a school such as Westside regards its student clubs as a mechanism for defining and transmitting fundamental values, the inclusion of a religious club in the school's program will almost certainly signal school endorsement of the religious practice.

Thus, the underlying difference between this case and *Widmar* is not that college and high school students have varying capacities to perceive the subtle differences between toleration and endorsement, but rather that the University of Missouri and Westside actually choose to define their respective missions in different ways. That high schools tend to emphasize student autonomy less than universities may suggest that high school administrators tend to perceive a difference in the maturity of secondary and university students. But the school's behavior, not the purported immaturity of high school students, is dispositive. If Westside stood apart from its club program and expressed the view, endorsed by Congress through its passage of the Act, that high school stu-

dents are capable of engaging in wide-ranging discussion of sensitive and controversial speech, the inclusion of religious groups in Westside's forum would confirm the school's commitment to nondiscrimination. Here, though, the Act requires the school to permit religious speech in a forum explicitly designed to advance the school's interest in shaping the character of its students.

The comprehensiveness of the access afforded by the Act further highlights the Establishment Clause dangers posed by the Act's application to fora such as Westside's. The Court holds that "[o]fficial recognition allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair." *Ante*, at 247 (citing App. 434–435). Students would be alerted to the meetings of the religion club over the public address system; they would see religion club material posted on the official school bulletin board and club notices in the school newspaper; they would be recruited to join the religion club at the school-sponsored Club Fair. If a school has a variety of ideological clubs, as in *Widmar*, I agree with the plurality that a student is likely to understand that "a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Ante*, at 250. When a school has a religion club but no other political or ideological organizations, however, that relatively fine distinction may be lost.

Moreover, in the absence of a truly robust forum that includes the participation of more than one advocacy-oriented group, the presence of a religious club could provide a fertile ground for peer pressure, especially if the club commanded support from a substantial portion of the student body. Indeed, it is precisely in a school without such a forum that intolerance for different religious and other views would be most dangerous and that a student who does not share the religious beliefs of his classmates would perceive "that religion or a particular religious belief is favored or preferred."

*Wallace* v. *Jaffree*, 472 U. S., at 70 (O'CONNOR, J., concurring in judgment).

The plurality concedes that there is a "possibility of *student* peer pressure," *ante*, at 251, but maintains that this does not amount to "official state endorsement." *Ibid.* This dismissal is too facile. We must remain sensitive, especially in the public schools, to "the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 627–628 (1989) (O'CONNOR, J., concurring in part and concurring in judgment). When the government, through mandatory attendance laws, brings students together in a highly controlled environment every day for the better part of their waking hours and regulates virtually every aspect of their existence during that time, we should not be so quick to dismiss the problem of peer pressure as if the school environment had nothing to do with creating and fostering it. The State has structured an environment in which students holding mainstream views may be able to coerce adherents of minority religions to attend club meetings or to adhere to club beliefs. Thus, the State cannot disclaim its responsibility for those resulting pressures.

## II

Given these substantial risks posed by the inclusion of the proposed Christian club within Westside's present forum, Westside must redefine its relationship to its club program. The plurality recognizes that such redefinition is necessary to avoid the risk of endorsement and construes the Act accordingly. The plurality holds that the Act "limits participation by school officials at meetings of student religious groups," *ante*, at 251 (citing §§ 4071(c)(2) and (3)), and requires religion club meetings to be held during noninstructional time, *ibid.* (citing § 4071(b)). It also holds that schools may not sponsor any religious meetings. *Ante*, at 253 (citing § 4072(2)). Fi-

nally, and perhaps most importantly, the plurality states that schools bear the responsibility for taking whatever further steps are necessary to make clear that their recognition of a religious club does not reflect their endorsement of the views of the club's participants. *Ante*, at 251.

Westside thus must do more than merely prohibit faculty members from actively participating in the Christian club's meetings. It must fully disassociate itself from the club's religious speech and avoid appearing to sponsor or endorse the club's goals. It could, for example, entirely discontinue encouraging student participation in clubs and clarify that the clubs are not instrumentally related to the school's overall mission. Or, if the school sought to continue its general endorsement of those student clubs that did not engage in controversial speech, it could do so if it also affirmatively disclaimed any endorsement of the Christian club.

### III

The inclusion of the Christian club in the type of forum presently established at Westside, without more, will not assure government neutrality toward religion. Rather, because the school endorses the extracurricular program as part of its educational mission, the inclusion of the Christian club in that program will convey to students the school-sanctioned message that involvement in religion develops "citizenship, wholesome attitudes, good human relations, knowledge and skills." App. 488. We need not question the value of that message to affirm that it is not the place of schools to issue it. Accordingly, schools such as Westside must be responsive not only to the broad terms of the Act's coverage, but also to this Court's mandate that they effectively disassociate themselves from the religious speech that now may become commonplace in their facilities.

JUSTICE STEVENS, dissenting.

The dictionary is a necessary, and sometimes sufficient, aid to the judge confronted with the task of construing an opaque

Act of Congress.  In a case like this, however, I believe we must probe more deeply to avoid a patently bizarre result. Can Congress really have intended to issue an order to every public high school in the Nation stating, in substance, that if you sponsor a chess club, a scuba diving club, or a French club—without having formal classes in those subjects—you must also open your doors to every religious, political, or social organization, no matter how controversial or distasteful its views may be?  I think not.  A fair review of the legislative history of the Equal Access Act (Act), 98 Stat. 1302, 20 U. S. C. §§4071–4074, discloses that Congress intended to recognize a much narrower forum than the Court has legislated into existence today.

I

The Act's basic design is easily summarized: when a public high school has a "limited open forum," it must not deny any student group access to that forum on the basis of the religious, political, philosophical, or other content of the speech of the group.  Although the consequences of having a limited open forum are thus quite clear, the definition of such a forum is less so.  Nevertheless, there is considerable agreement about how this difficulty must be resolved.  The Court correctly identifies three useful guides to Congress' intent. First, the text of the statute says that a school creates a limited open forum if it allows meetings on school premises by "noncurriculum related student groups," a concept that is ambiguous at best.[1]  *Ante*, at 237.  Second, because this concept is ambiguous, the statute must be interpreted by reference to its general purpose, as revealed by its overall structure and by the legislative history.  See *ante*, at 238–239. Third, the Act's legislative history reveals that Congress intended to guarantee student religious groups access to high school fora comparable to the college forum involved in

---

[1] For an extensive discussion of the phrase and its ambiguity, see Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 Nw. U. L. Rev. 1, 36–41 (1986).

*Widmar* v. *Vincent*, 454 U. S. 263 (1981). *Ante*, at 235, 239. All of this is common ground, shared by the parties and by every Court of Appeals to have construed the Act.[2]

A fourth agreement would seem to follow from these three. If "noncurriculum related" is an ambiguous term, and if it must therefore be interpreted in light of congressional purpose, and if the purpose of Congress was to ensure that the rule of *Widmar* applied to high schools as it did to colleges, then the incidence of the Act in this case should depend upon whether, in light of *Widmar*, Westside would have to permit the Christian student group to meet if Westside were a college.[3] The characteristics of the college forum in *Widmar* should thus provide a useful background for interpreting the meaning of the undefined term "noncurriculum related student groups." But this step the Court does not take, and it is accordingly here that I part company with it.

Our decision in *Widmar* encompassed two constitutional holdings. First, we interpreted the Free Speech Clause of the First Amendment to determine whether the University of Missouri at Kansas City had, by its own policies, abdicated discretion that it would otherwise have to make content-based discriminations among student groups seeking to meet on its campus. We agreed that it had. 454 U. S., at 269; see also *id.*, at 280–281 (STEVENS, J., concurring in judgment). Next, we interpreted the Establishment Clause of the First Amendment to determine whether the university was prohibited from permitting student-initiated religious groups to participate in that forum. We agreed that it was

---

[2] Brief for Petitioners 58–59; Brief for Respondents 34–40; Brief for United States as *Amicus Curiae* 17–19, and nn. 21–22 (Act codifies *Widmar*); *id.*, at 22 ("noncurriculum related" is an undefined term); *id.*, at 25 ("noncurriculum related" should be construed by reference to the "larger objectives" of the Act); 867 F. 2d 1076, 1078–1079 (CA8 1989); *Garnett* v. *Renton School Dist. No. 403*, 874 F. 2d 608, 613–614 (CA9 1989).

[3] We would, of course, then have to consider, as the Court does now, whether the Establishment Clause permits Congress to apply *Widmar*'s reasoning to secondary schools.

not. *Id.*, at 270–277; see also, *id.*, at 280–281 (STEVENS, J., concurring in judgment).

To extend *Widmar* to high schools, then, would require us to pose two questions. We would first ask whether a high school had established a forum comparable under our Free Speech Clause jurisprudence to that which existed in *Widmar*. Only if this question were answered affirmatively would we then need to test the constitutionality of the Act by asking whether the Establishment Clause has different consequences when applied to a high school's open forum than when applied to a college's. I believe that in this case the first question must instead be answered in the negative, and that this answer ultimately proves dispositive under the Act just as it would were only constitutional considerations in play.

The forum at Westside is considerably different from that which existed at the University of Missouri. In *Widmar*, we held that the university had created "a generally open forum," *id.*, at 269. Over 100 officially recognized student groups routinely participated in that forum. *Id.*, at 265. They included groups whose activities not only were unrelated to any specific courses, but also were of a kind that a state university could not properly sponsor or endorse. Thus, for example, they included such political organizations as the Young Socialist Alliance, the Women's Union, and the Young Democrats. See *id.*, at 274; *Chess* v. *Widmar*, 635 F. 2d 1310, 1312, and n. 1 (CA8 1980). The university permitted use of its facilities for speakers advocating transcendental meditation and humanism. Since the university had allowed such organizations and speakers the use of campus facilities, we concluded that the university could not discriminate against a religious group on the basis of the content of its speech. The forum established by the state university accommodated participating groups that were "noncurriculum related" not only because they did not mirror the school's classroom instruction, but also because they advocated

controversial positions that a state university's obligation of neutrality prevented it from endorsing.

The Court's opinion in *Widmar* left open the question whether its holding would apply to a public high school that had established a similar public forum. That question has now been answered in the affirmative by the District Court, the Court of Appeals, and by this Court. I agree with that answer. Before the question was answered judicially, Congress decided to answer it legislatively in order to preclude continued unconstitutional discrimination against high school students interested in religious speech. According to Senator Hatfield, a cosponsor of the Act: "All [it] does is merely to try to protect, as I say, a right that is guaranteed under the Constitution that is being denied certain students." 130 Cong. Rec. 19218 (1984). As the Court of Appeals correctly recognized, the Act codified the decision in *Widmar*, "extending that holding to secondary public schools." 867 F. 2d 1076, 1079, and n. 1 (CA8 1989).[4] What the Court of Appeals failed to recognize, however, is the critical difference between the university forum in *Widmar* and the high school forum involved in this case. None of the clubs at the high school are even arguably controversial or partisan.[5]

---

[4] The Court of Appeals quoted the following comment by Senator Levin:

"[T]he pending amendment is constitutional in light of the Supreme Court's decision in Widmar against Vincent. This amendment merely extends a similar constitutional rule as enunciated by the Court in Widmar to secondary schools." 130 Cong. Rec. 19236 (1984).

Other Senators agreed. See *id.*, at 19221 (statement of Sen. Leahy); *id.*, at 19237 ("[T]he Court was right in Widmar, and this bill seeks only to clarify and extend the law of that case a bit. . . . What we seek to do by this amendment is make clear that the same rule of law applies to students in our public secondary schools") (statement of Sen. Bumpers); *id.*, at 19239 (statement of Sen. Biden). See also Brief for United States as *Amicus Curiae* 17–19, nn. 21–22 (collecting references to *Widmar* from Senate and House debates).

[5] The Court of Appeals also put too much weight upon the existence of a chess club at Westside. The court quoted an exchange between Senator Gorton and Senator Hatfield in which Senator Hatfield, a cosponsor of the

Nor would it be wise to ignore this difference. High school students may be adult enough to distinguish between those organizations that are sponsored by the school and those which lack school sponsorship even though they participate in a forum that the school does sponsor. See *ante*, at 250. But high school students are also young enough that open fora may be less suitable for them than for college students. The need to decide whether to risk treating students as adults too soon, or alternatively to risk treating them as children too long, is an enduring problem for all educators. The youth of these students, whether described in terms of "impressionability" or "maturity," may be irrelevant to our application of the constitutional restrictions that limit educational discretion in the public schools, but it surely is not irrelevant to our interpretation of the educational policies that have been adopted. We would do no honor to Westside's administrators or the Congress by assuming that either treated casually the differences between high school and college students when formulating the policy and the statute at issue here.[6]

---

Act, told Senator Gorton that a chess club would be "noncurriculum related" under the Act. 867 F. 2d, at 1078–1079. The exchange is completely inconclusive, however, when read in context. Senator Gorton's questions were designed to show that Senator Hatfield could not offer any satisfactory definition of "noncurriculum related." Senator Gorton's strategy succeeded, and in the course of the exchange Senator "Hatfield offered just about every possible interpretation in less than two columns of the *Congressional Record*." Laycock, 81 Nw. U. L. Rev., at 37. Senator Hatfield eventually conceded that whether a chess club was "noncurriculum related" would depend upon what the school district's lawyers had to say about it. 130 Cong. Rec. 19225 (1984). This Court's majority does not place any special emphasis upon Senator Hatfield's reference to chess clubs, see *ante*, at 245–246 (discussing chess clubs without reference to the legislative history), and I agree that it deserves none.

[6] What I have said before of universities is true *a fortiori* with respect to high schools: A school's extracurricular activities constitute a part of the school's teaching mission, and the school accordingly must make "decisions concerning the content of those activities." *Widmar* v. *Vincent*, 454 U. S.

For these reasons, I believe that the distinctions between Westside's program and the University of Missouri's program suggest what is the best understanding of the Act: An extracurricular student organization is "noncurriculum related" if it has as its purpose (or as part of its purpose) the advocacy of partisan theological, political, or ethical views. A school that admits at least one such club has apparently made the judgment that students are better off if the student community is permitted to, and perhaps even encouraged to, compete along ideological lines. This pedagogical strategy may be defensible or even desirable. But it is wrong to presume that Congress endorsed that strategy—and dictated its nationwide adoption—simply because it approved the application of *Widmar* to high schools. And it seems absurd to presume that Westside has invoked the same strategy by recognizing clubs like the Swimming Timing Team and Subsurfers which, though they may not correspond directly to anything in Westside's course offerings, are no more controversial than a grilled cheese sandwich.

Accordingly, as I would construe the Act, a high school could properly sponsor a French club, a chess club, or a scuba diving club simply because their activities are fully consistent with the school's curricular mission. It would not matter whether formal courses in any of those subjects—or in directly related subjects—were being offered as long as faculty encouragement of student participation in such groups would be consistent with both the school's obligation of neutrality and its legitimate pedagogical concerns. Nothing in *Widmar* implies that the existence of a French club, for example, would create a constitutional obligation to allow student members of the Ku Klux Klan or the Communist Party to

263, 278 (1981) (STEVENS, J., concurring in judgment). Absent good reason to hold otherwise, these decisions should be left to teachers. *Id.*, at 279, and n. 2. See also *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 691, and n. 1 (1986) (STEVENS, J., dissenting).

have access to school facilities.[7]   More importantly, nothing in that case suggests that the constitutional issue should turn on whether French is being taught in a formal course while the club is functioning.

Conversely, if a high school decides to allow political groups to use its facilities, it plainly cannot discriminate among controversial groups because it agrees with the positions of some and disagrees with the ideas advocated by others.   Again, the fact that the history of the Republican Party might be taught in a political science course could not justify a decision to allow the young Republicans to form a club while denying Communists, white supremacists, or Christian Scientists the same privilege.   In my judgment, the political activities of the young Republicans are "noncurriculum related" for reasons that have nothing to do with the content of the political science course.   The statutory definition of what is "noncurriculum related" should depend on the constitutional concern that motivated our decision in *Widmar*.

In this case, the District Judge reviewed each of the clubs in the high school program and found that they are all "tied to the educational function of the institution."   App. B to Pet. for Cert. 25–26.   He correctly concluded that this club system "differs dramatically from those found to create an open forum policy in *Widmar* and *Bender*."   *Id.*, at 26.[8]   I agree

---

[7] Although I recognize that JUSTICE MARSHALL reads *Widmar* more broadly, I respectfully disagree with that reading.   Moreover, even if language in *Widmar* supported that reading, the language would be dictum, given the distinction—acknowledged to be critical—between "the wide-open and independent character of the student forum in *Widmar*" and the substantially different character of Westside's program.   See *ante*, at 265 (MARSHALL, J., concurring).

[8] In *Bender* v. *Williamsport Area School Dist.*, 563 F. Supp. 697 (MD Pa. 1983), the school officials conceded that any organization conducive to the intellectual or moral growth of students could meet during the activities period.   Unlike the school officials in this case, the Williamsport officials had not claimed that the forum was limited on the basis of whether a

with his conclusion that, under a proper interpretation of the Act, this dramatic difference requires a different result.

As I have already indicated, the majority, although it agrees that Congress intended by this Act to endorse the applicaton of *Widmar* to high schools, does not compare this case to *Widmar*. Instead, the Court argues from two other propositions: first, that Congress intended to prohibit discrimination against religious groups; and, second, that the statute must not be construed in a fashion that would allow school boards to circumvent its reach by definitional fiat. I am in complete agreement with both of these principles. I do not, however, believe that either yields the conclusion which the majority adopts.

First, as the majority correctly observes, Congress intended the Act to prohibit schools from excluding—or believing that they were legally obliged to exclude—religious student groups solely because the groups were religious. Congress was clearly concerned with two lines of decisions in the Courts of Appeals: one line prohibiting schools that wished to admit student-initiated religious groups from doing so, see *Lubbock Civil Liberties Union* v. *Lubbock Independent School Dist.*, 669 F. 2d 1038, 1042–1048 (CA5 1982), cert. denied, 459 U. S. 1155 (1983), and a second line allowing schools to exclude religious groups solely because of Establishment Clause concerns, see *Brandon* v. *Guilderland Bd. of Ed.*, 635 F. 2d 971 (CA2 1980), cert. denied, 454 U. S. 1123 (1981); see also *Bender* v. *Williamsport Area School Dist.*, 563 F. Supp. 697 (MD Pa. 1983), rev'd, 741 F. 2d 538 (CA3 1984), vacated on other grounds, 475 U. S. 534 (1986).[9] See *ante*, at 239. These cases, however, involve only schools which either desire to recognize religious student groups, or

---

group presented a one-sided view of controversial subjects. *Id.*, at 706–707.

[9] The *Bender* litigation was pending before the Court of Appeals for the Third Circuit when the Act was drafted, and was much discussed by the Act's sponsors.

schools which, like the University of Missouri at Kansas City, purport to exclude religious groups from a forum that is otherwise conceded to be open. It is obvious that Congress need go no further than our *Widmar* decision to redress this problem, and equally obvious that the majority's expansive reading of "noncurriculum related" is irrelevant to the congressional objective of ending discrimination against religious student groups.

Second, the majority is surely correct that a "'limited open forum should be triggered by what a school does, not by what it says.'" *Ante*, at 244, quoting 130 Cong. Rec. 19222 (1984) (statement of Sen. Leahy). If, however, it is the recognition of advocacy groups that signals the creation of such a forum, I see no danger that school administrators will be able to manipulate the Act to defeat Congressional intent.[10] Indeed, it seems to me that it is the majority's own test that is suspect on this score.[11] It would appear that the school could alter the "noncurriculum related" status of Subsurfers, see *ante*, at 245, simply by, for example, including one day of scuba instruction in its swimming classes, or by requiring

---

[10] Since the statute as I construe it would track our own Free Speech Clause jurisprudence, administrators could no more escape the Act's restrictions by mere labeling than they could escape the First Amendment itself by such means.

[11] According to the Court:

"In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit." *Ante*, at 239–240.

The Court clarifies the meaning of the second part of this test by suggesting that "[a] school's student government would generally relate directly to the curriculum to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school." *Ante*, at 240. Likewise, the fact that the International Club is "'developed through our foreign language classes'" suffices to satisfy the Court's test, presumably as a result of its first prong. See *ante*, at 246.

physical education teachers to urge student participation in the club, or even by soliciting regular comments from the club about how the school could better accommodate the club's interest within coursework.[12]   This may be what the school does rather than what it says, but the "doing" is mere bureaucratic procedure unrelated to the substance of the forum or the speech it encompasses.

Not only is the Court's preferred construction subject to manipulation, but it also is exceptionally difficult to apply even in the absence of deliberate evasion.   For example, the Court believes that Westside's swim team is "directly related" to the curriculum, but the scuba diving club is not. *Ibid.*   The Court's analysis makes every high school football program a borderline case, for while many schools teach football in physical education classes, they usually teach touch football or flag football, and the varsity team usually plays tackle football.   Tackle football involves more equipment and greater risk, and so arguably stands in the same relation to touch football as scuba diving does to swimming.   Likewise, it would appear that high school administrators might reasonably have difficulty figuring out whether a cheerleading squad or pep club might trigger the Act's application.   The answer, I suppose, might depend upon how strongly students were encouraged to support the football team.   Obviously, every test will produce some hard cases,[13] but the Court's test seems to produce nothing but hard cases.

---

[12] The club's membership might have a special interest in seeing more attention devoted to ichthyological topics in biology classes, in adding oceanographic examples to physics classes, and in allowing advanced students in the school shops to design snorkeling gear.   As I understand the majority's test, Subsurfers would not be "noncurriculum related" so long as the club made such suggestions as these on a regular basis, even if the Westside administration regularly thanked the club and rejected every suggestion it made.   See *ante*, at 240 (discussing the student government).

[13] Under my reading of the statute, for example, a difficult case might be posed if a district court were forced to decide whether a high school's Nietzsche Club were concerned with philology or doctrine.   None of the

For all of these reasons, the argument for construing "non-curriculum related" by recourse to the facts of *Widmar*, and so by reference to the existence of advocacy groups, seems to me overwhelming. It provides a test that is both more simple and more easily administered than what the majority has crafted. Indeed, the only plausible answer to this construction of the statute is that it could easily be achieved without reference to the exotic concept of "noncurriculum related" organizations. This point was made at length on the Senate floor by Senator Gorton.[14] Senator Hatfield answered that the term had been recommended to him by lawyers, apparently in an effort to capture the distinctions important to the judiciary's construction of the Free Speech Clause.[15]

---

very common clubs at Westside, however, causes any difficulties for this test, while nearly all of them present close questions if examined pursuant to the Court's rubric. The Nietzsche Club is a problem that can be dealt with when it actually arises.

[14] Senator Gorton proposed replacing the Act with another, which read: "No public secondary school receiving Federal financial assistance shall prohibit the use of school facilities for meetings during noninstructional time by voluntary student groups solely on the basis that some or all of the speech engaged in by members of such groups during their meetings is or will be religious in nature." 130 Cong. Rec. 19225 (1984).

[15] Senator Hatfield attributed the Act's complex terminology to "too many lawyers wanting to put something down to satisfy one particular legal point of view, one legal school, or one precedent, or one court decision, or one experience." *Ibid.*

In light of this admission and similar statements, it is astonishing that the United States asks us to believe that Congress, by using the phrase "noncurriculum related," intended to reject *Widmar*'s definition of an "open forum" in favor of a definition that would be "highly specific" and less confusing. See Brief for United States as *Amicus Curiae* 20–21. I am instead inclined to agree with Professor Laycock, who observes that "[a] House opponent [of the Act] was surely correct when he said that not even the sponsors of the bill knew what it meant." Laycock, 81 Nw. U. L. Rev., at 38. The bill's supporters admitted that its language was murky, but suggested that something was better than nothing. See 130 Cong. Rec. 20946 (statement of Rep. Hyde). If Congress really intended to de-

Congress may sometimes, however, have a clear intent with respect to the whole of a statute even when it muddles the definition of a particular part, just as, in other cases, the intent behind a particular provision may be clear though the more comprehensive purpose of the statute is obscure. In this case, Congress' general intent is — as Senator Gorton certainly understood — a necessary guide to the Act's more particular terms. In answer to this strategy, the Court points out that references to *Widmar* must be considered in context. *Ante*, at 242–243. That is surely so. But when this is done it becomes immediately clear that those references are neither "few" nor "passing" nor even "general," *ante*, at 242; they are instead the sheet anchors holding fast a debate that would otherwise be swept away in a gale of confused utterances.[16]

---

part from *Widmar* for reasons of administrative clarity, Congress kept its intent well hidden, both in the statute and in the debates preceding its passage.

[16] The Court makes a gallant, and commendable, effort to vindicate Congress' peculiar diction. But I fear that in the end the Court's dogged persistence leads it to miss the forest for the trees. The Court quite properly points out that Congress' general intent cannot be established by a single reference, or even several statements, sundered from context. One can, of course, no more deduce the meaning of legislative history by quoting one randomly chosen Senator than one can capture the meaning of a play by quoting one randomly chosen character. To say that Polonius, Claudius, and Gertrude express differing views about Hamlet's "antic disposition" is not to say that *Hamlet* has no meaning. No reader of the congressional drama in this case can come away unimpressed by its focus upon *Widmar:* The congressional actors quite clearly agreed that *Widmar*'s rule should be extended to high schools, but were confused about how to draft a statute that did so. Nothing quoted by the Court so much as hints at a contrary reading.

The Court's discussion of Senator Levin's speech, *ante*, at 243, is especially puzzling. The Court says that this dissent "plac[es] great reliance on a comment by Senator Levin." *Ibid.* In fact, Senator Levin's remark is 1 among 4 specific citations in a single footnote, and is further buttressed by the more than 20 additional citations collected in the brief of the United States as *amicus curiae.* See n. 4, *supra.* The footnote singles out Sen-

We might wish, along with Senator Gorton, that Congress had chosen a better term to effectuate its purposes.  But our own efforts to articulate "public forum" analysis have not, in my opinion, been altogether satisfactory.  See *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 833 (1985) (STEVENS, J., dissenting).[17]  Lawyers and legislators seeking to capture our distinctions in legislative terminology should be forgiven if they occasionally stumble.[18]  Certainly

ator Levin for special attention not because his views are of unique importance, but because his remarks were quoted by the Court of Appeals. *Ibid.*  Still odder is the Court's own use of Senator Levin.  The Court quotes the Senator as saying, "The pending amendment will allow students equal access to secondary schools student-initiated religious meetings before and after school where the school generally allows groups of secondary school students to meet during those times."  130 Cong. Rec. 19236 (1984).  The Court emphasizes the word "generally."  This word, however, puts Senator Levin in square opposition to the Court's reading of the Act.  I agree with the Senator that the Act authorizes meetings by religious student-initiated groups in schools that permit meetings by student groups in general; the Court, however, must show that the Act authorizes such meetings even in schools that have a less generally open forum, one defined specifically enough to exclude partisan ideological organizations. Senator Levin's statement does not help the Court.

Nor can the Court claim any assistance from the reservations expressed by Senators Chiles and Denton about the legislative history, *ante*, at 243: When their remarks are considered in context, it becomes immediately apparent that both men were addressing specific problems completely unrelated to the Act's connection with *Widmar*.

[17] See also Farber & Nowak, The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication, 70 Va. L. Rev. 1219, 1223–1225 (1984); L. Tribe, American Constitutional Law § 12–24 (2d ed. 1988).

[18] The Court would have us believe that the step is not a stumble but a pirouette: The Court declares that any possible interpretation of the Act must concede that Congress intended to draw a subtle distinction between a "limited public forum" and a "limited open forum."  *Ante*, at 242.  For the reasons given in n. 15, *supra*, I find this suggestion implausible: The drafting of this legislation was not so finely choreographed.

Moreover, this Court's own opinion in *Widmar* refers, in quick succession and without apparent distinction, to "a forum generally open to the

we should not hold Congress to a standard of precision we ourselves are sometimes unable to obtain. "Our duty is to ask what Congress intended, and not to assay whether Congress might have stated that intent more naturally, more artfully, or more pithily." *Sullivan* v. *Everhart*, 494 U. S. 83, 106 (1990) (STEVENS, J., dissenting).

## II

My construction of the Act makes it unnecessary to reach the Establishment Clause question that the plurality decides.[19] It is nevertheless appropriate to point out that the question is much more difficult than the plurality assumes.[20]

---

public," 454 U. S., at 268; "a generally open forum," *id.*, at 269; and "a public forum," *id.*, at 270. The District Court opinion in *Bender*—an opinion of great concern to Congress when it passed this Act—observed that "a university which accommodates student organizations by making its facilities 'generally open' for their meetings will have created a 'limited' public forum." 563 F. Supp., at 705. In the same month the Act was passed, the Court of Appeals' opinion in *Bender* closed the circle by using "limited open forum" to describe the First Amendment status of both the college forum in *Widmar* and the high school forum in *Bender*. *Bender* v. *Williamsport Area School Dist.*, 741 F. 2d 538, 547, n. 12 (CA3 1984); *id.*, at 550. It would be wrong to say that the Court today slices these distinctions too thin: There is in fact no distinction for the slicing.

Even were I to accept the Court's premise, however, it would not lead me to the Court's conclusion. It does not seem that a "limited open forum" would be, as the Court must suppose, *narrower* in scope than a "limited public forum." Dictionary definitions, which the Court seems to favor, point in the opposite direction.

[19] We consider Establishment Clause questions under the three-part analysis set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971): "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, . . . ; finally, the statute must not foster 'an excessive government entanglement with religion.'" (Citations omitted.)

[20] The difficulty of the constitutional question compounds the problems with the Court's treatment of the statutory issue. In light of the ambiguity which it concedes to exist in both the statutory text and the legislative history, the Court has an obligation to adopt an equally reasonable con-

The plurality focuses upon whether the Act might run afoul of the Establishment Clause because of the danger that some students will mistakenly believe that the student-intiated religious clubs are sponsored by the school.[21]  I believe that the

---

struction of the Act that will avoid the constitutional issue.  Cf. *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 500 (1979).

[21] The plurality also considers briefly, and then rejects, the possibility that the Act may lack the "secular purpose" required by the Establishment Clause.  See *ante,* at 248–249.  In my view, that question, too, is closer than the plurality suggests.  There is no doubt that the purpose of this Act is to facilitate meetings by religious student organizations at public high schools.  See, *e. g.,* 130 Cong. Rec. 19216 (1984) (statement of Sen. Denton).  There would nevertheless be no problem with the Act if it did no more than redress discrimination against religion.  See *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos,* 483 U. S. 327, 338 (1987) (characterizing as "proper" the statutory "purpose of lifting a regulation that burdens the exercise of religion," even if the resulting exemption does not "come packaged with benefits to secular entities").  Under the Court's reading of the Act, however, Congress had a considerably more expansive purpose: that of authorizing religious groups to meet even in schools that prohibit assembly of all partisan organizations and thus do not single out religious groups in particular.  The Act also authorizes meetings of political or philosophic as well as religious groups, but it is clear that Congress was principally interested in religious speech.  *Ante,* at 239.  The application of *Lemon*'s secular purpose requirement to the Act thus becomes more complicated.

When examining this issue, the plurality quite properly recognizes that we must distinguish between religious *motives* and religious *purposes.* See *ante,* at 249.  The plurality, however, misapplies the distinction.  If a particular legislator were to vote for a bill on the basis of a personal, religious belief that free speech is a good thing, the legislator would have a religious motive.  That motive would present no problem under the Establishment Clause.  If, however, the legislator were to vote for the bill on the basis of a prediction that the resulting speech would be religious in character, then the legislator would have a religious purpose.  That would present a problem under the Establishment Clause.  It is, moreover, entirely possible that this religious purpose might exist even absent a religious motive, as would be the case if the legislator's only reason for favoring religious speech was a belief that it would tend to produce cooperative behavior and so reduce the crime rate.  It is the latter, not the former, kind of religious intention that is at issue here.  As such, the plurality's

plurality's construction of the statute obliges it to answer a further question: whether the Act violates the Establishment Clause by authorizing religious organizations to meet on high school grounds even when the high school's teachers and administrators deem it unwise to admit controversial or partisan organizations of any kind.

Under the plurality's interpretation of the Act, Congress has imposed a difficult choice on public high schools receiving federal financial assistance. If such a school continues to allow students to participate in such familiar and innocuous activities as a school chess or scuba diving club, it must also allow religious groups to make use of school facilities. In-

---

analysis of *Lemon*'s purpose requirement presupposes that having a religious *purpose* for enacting a statute becomes analogous to having a religious *motive* for enacting the statute whenever the statute confers some incidental benefit upon secular activity. With this I cannot agree.

To survive scrutiny under the *Lemon* test, it is not enough that a statute's sponsors identify some secular goals allegedly served by the Act. We have held that a statute is unconstitutional if it "does not have a clearly secular purpose," *Wallace* v. *Jaffree*, 472 U. S. 38, 56 (1985), or if its "primary purpose was to . . . provide persuasive advantage to a particular religious doctrine." *Edwards* v. *Aguillard*, 482 U. S. 578, 592 (1987). A law requiring that the Ten Commandments be posted in school classrooms is not vindicated by the possibility that reading it would teach students about a "fundamental legal code," *Stone* v. *Graham*, 449 U. S. 39, 41 (1980), and a law requiring recitation of the Lord's Prayer is likewise not saved by assertions — true or not — that such a practice serves the "promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 223 (1963).

In sum, the crucial question, under the purpose requirement of the *Lemon* test, is whether the challenged statute reflects a judgment that it would be desirable for people to be religious or to adhere to a particular religion. The plurality is correct to observe that it is irrelevant whether the legislature itself behaved religiously when it made (or abstained from making) that judgment. The plurality's observation, however, is likewise irrelevant to the question before us. The Act may nevertheless comply with the purpose requirement of the *Lemon* test by encompassing political and philosophic as well as religious speech, but that conclusion requires more explanation than the Court provides.

deed, it is hard to see how a cheerleading squad or a pep club, among the most common student groups in American high schools, could avoid being "noncurriculum related" under the majority's test. The Act, as construed by the majority, .comes perilously close to an outright command to allow organized prayer, and perhaps the kind of religious ceremonies involved in *Widmar*, on school premises.

We have always treated with special sensitivity the Establishment Clause problems that result when religious observances are moved into the public schools. *Edwards* v. *Aguillard*, 482 U. S. 578, 583–584 (1987). "The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools . . . ." *Illinois ex rel. McCollum* v. *Board of Ed. of School Dist. No. 71, Champaign County*, 333 U. S. 203, 231 (1948) (Frankfurter, J., concurring). As the plurality recognizes, *ante*, at 251, student-initiated religious groups may exert a considerable degree of pressure even without official school sponsorship. "The law of imitation operates, and nonconformity is not an outstanding characteristic of children." *McCollum*, 333 U. S., at 227 (Frankfurter, J., concurring); see also *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 290–291 (1963) (BRENNAN, J., concurring). Testimony in this case indicated that one purpose of the proposed Bible Club was to convert students to Christianity. App. 185. The influence that could result is the product not only of the Act and student-initiated speech, but also of the compulsory attendance laws, which we have long recognized to be of special constitutional importance in this context. *Id.*, at 252–253; *Wallace* v. *Jaffree*, 472 U. S. 38, 60, n. 51 (1985). Moreover, the speech allowed is not simply the individual expression of personal conscience, as was the case in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), or *West Virginia State Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), but is instead the collective statement of an organiza-

tion—a "student club," with powers and responsibilities defined by that status—that would not exist absent the State's intervention.[22]

I tend to agree with the plurality that the Constitution does not forbid a local school district, or Congress, to bring organized religion into the schools so long as all groups, religious or not, are welcomed equally if "they do not break either the laws or the furniture."[23]   That Congress has such authority, however, does not mean that the concerns underlying the Establishment Clause are irrelevant when, and if, that authority is exercised.[24]   Certainly we should not rush to embrace the conclusion that Congress swept aside these concerns by the hurried passage of clumsily drafted legislation.[25]

---

[22] Respondents have sought not merely access to school meeting rooms, but also "the same rights, privileges, terms and conditions accorded to other clubs" at Westside.   Brief for Respondents 1, and n. 2.   In this respect, at least, this case resembles *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260 (1988), more than it does *Tinker* v. *Des Moines Independent Community School Dist.*   Cf. Stewart, The First Amendment, The Public Schools, and the Inculcation of Community Values, 18 J. Law & Ed. 23, 36 (1989) (stressing distinction between "cases . . . in which students seek only to prevent state interference with their communicative activities, and cases . . . in which students seek active assistance in the dissemination of their ideas").

[23] The quotation is from Congressman Frank, who spoke in support of the bill on the House floor.   130 Cong. Rec. 20933 (1984).

[24] The bill enjoyed "wide, bipartisan" support in both Houses, *ante*, at 239, but it likewise provoked thoughtful, bipartisan opposition in each body. Senator Chafee was among those who opposed the bill; he warned his colleagues that passing it might secure religious access to the schools only at the price of educational quality: "Legislation to encourage religious and political activity in the schools will do little to resolve our problems in education but could lead to discord between those whose cooperation in the drive for excellence in education is more important than ever."   130 Cong. Rec. 19248 (1984).

[25] Professor Laycock summarizes the circumstances of the Act's passage as follows:

There is an additional reason, also grounded in constitutional structure, why the Court's rendering of the Act is unsatisfying: So construed, the Act alters considerably the balance between state and federal authority over education, a balance long respected by both Congress and this Court. See, *e. g.*, *Board of Education, Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U. S. 853, 863–864 (1982). The traditional allocation of responsibility makes sense for pedagogical, political, and ethical reasons.[26] We have, of course, sometimes found it necessary to limit local control over schools in order to protect the constitutional integrity of public education. "That [boards of education] are educating

―――――――――

"The bill was completely rewritten in a series of multilateral negotiations after it was passed by the House and reported out of committee in the Senate. Thus, the committee reports cast no light on the language actually adopted. Senator Hatfield offered the negotiated compromise as a floor amendment in the midst of the Senate's rush to adjourn for the Fourth of July. He repeatedly emphasized that as many as 1,000 people had been involved in the negotiations that produced the compromise version, and that not all the senators sponsoring the compromise agreed with everything in it. Senator Gorton accurately observed that too many cooks had spoiled the broth. But Hatfield had a large majority committed to his compromise, and he resisted any change that might have caused the deal to fall apart. The Hatfield compromise later passed the House under a special rule that precluded amendments and limited debate to one hour." 81 Nw. U. L. Rev., at 37 (footnotes omitted).

[26] As a matter of pedagogy, delicate decisions about immersing young students in ideological cross-currents ought to be made by educators familiar with the experience and needs of the particular children affected and with the culture of the community in which they are likely to live as adults. See *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S., at 271–272. As a matter of politics, public schools are often dependent for financial support upon local communities. The schools may be better able to retain local favor if they are free to shape their policies in response to local preferences. See *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 49–53 (1973). As a matter of ethics, it is sensible to respect the desire of parents to guide the education of their children without surrendering control to distant politicians. See *Meyer* v. *Nebraska*, 262 U. S. 390, 399–403 (1923).

the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S., at 637; see also *Brown* v. *Board of Education*, 347 U. S. 483 (1954); *Missouri* v. *Jenkins*, 495 U. S. 33 (1990). Congress may make similar judgments, and has sometimes done so, finding it necessary to regulate public education in order to achieve important national goals.

The Court's construction of this Act, however, leads to a sweeping intrusion by the Federal Government into the operation of our public schools, and does so despite the absence of any indication that Congress intended to divest local school districts of their power to shape the educational environment. If a high school administration continues to believe that it is sound policy to exclude controversial groups, such as political clubs, the Ku Klux Klan, and perhaps gay rights advocacy groups, from its facilities, it now must also close its doors to traditional extracurricular activities that are noncontroversial but not directly related to any course being offered at the school. Congress made frequent reference to the primacy of local control in public education, and the legislative history of the Act is thus inconsistent with the Court's rigid definition of "noncurriculum related groups."[27] In-

---

[27] See, *e. g.*, 130 Cong. Rec. 19217 (1984) ("I am fully committed to the proposition that schools and education in general must be under the guidance and control of local school districts, local school boards, State school boards, and so forth. But where there is an action that is taken by such an official body, representing the public schools, which denies a right that is guaranteed under the Constitution, then the Congress of the United States, I think, has a duty and an obligation to step in and remedy that violated right") (statement of Sen. Hatfield). The Court does not suggest that Westside has deprived its students of any constitutionally guaranteed rights in this case. See also *id.*, at 20941 ("The bill only applies if the school voluntarily creates a limited open forum. Everything is left to the

deed, the very fact that Congress omitted any definition in the statute itself is persuasive evidence of an intent to allow local officials broad discretion in deciding whether or not to create limited public fora. I see no reason—and no evidence of congressional intent—to constrain that discretion any more narrowly than our holding in *Widmar* requires.

## III

Against all these arguments the Court interposes Noah Webster's famous dictionary. It is a massive tome but no match for the weight the Court would put upon it. The Court relies heavily on the dictionary's definition of "curriculum." See *ante*, at 237. That word, of course, is not the Act's; moreover, the word "noncurriculum" is not in the dictionary. Neither Webster nor Congress has authorized us to assume that "noncurriculum" is a precise antonym of the word "curriculum." "Nonplus," for example, does not mean "minus" and it would be incorrect to assume that a "nonentity" is not an "entity" at all. Purely as a matter of defining a newly coined word, the term "noncurriculum" could fairly be construed to describe either the subjects that are "not a part of the current curriculum" or the subjects that "cannot properly be included in a public school curriculum." Either of those definitions is perfectly "sensible" because both describe subjects "that are not related to the body of courses offered by the school." See *ante*, at 237. When one considers the basic purpose of the Act, and its unquestioned linkage to our decision in *Widmar*, the latter definition surely is the more "sensible."

I respectfully dissent.

---

local option. Everything is left to the local administrators and the local school board") (statement of Rep. Goodling).