**LAMB'S CHAPEL and John Steigerwald, Plaintiffs–Appellants,**

v.

**CENTER MORICHES UNION FREE SCHOOL DISTRICT and Louise Tramontano, in her official capacity as president of the Board of Education for Center Moriches Schools, Defendants–Appellees,**

**New York State Attorney General's Office, Intervenor.**

**No. 470, Docket 91–7718.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1991.

Decided March 18, 1992.

Mark N. Troobnick, Washington, D.C. (Jordan W. Lorence, Concerned Women for America Legal Foundation, Jay A. Sekulow, Walter M. Weber, Free Speech Advocates, of counsel), for plaintiffs-appellants.

Harold G. Trabold, Patchogue, N.Y. (Dranitzke, Lechtrecker & Trabold, Patchogue, N.Y., August H. Englert, Fiedelman & Hoefling, Jericho, N.Y., of counsel) for defendants-appellees Center Moriches Union Free School Dist. and Louise Tramontano.

Jeffrey I. Slonim, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., Lawrence S. Kahn, Deputy Sol. Gen., Atty. Gen.'s Office, State of N.Y., of counsel), for intervenor New York State Atty. Gen.

Jay Worona, Albany, N.Y. (Cynthia P. Fletcher, New York State School Boards Ass'n, Inc., of counsel) for amicus curiae New York State School Boards Ass'n, Inc.

Before CARDAMONE, PIERCE and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellants Lamb's Chapel and John Steigerwald appeal from a summary judgment entered in the United States District Court for the Eastern District of New York (Wexler, J.) in favor of defendants-appellees Center Moriches Union Free School District and Louise Tramontano, as President of the Board of Education of the School District. Lamb's Chapel is an Evangelical Christian church, incorporated under the New York not-for-profit corporation law, located at Center Moriches, Suffolk County, New York. John Steigerwald is the Pastor of Lamb's Chapel. The School District is a subdivision of the State of New York duly organized to provide public education in Suffolk County. This action was brought to secure declaratory and injunctive relief as redress for the refusal of the School District to allow the use of School District facilities, during non-school hours, for the showing of a series of religious films. The School District relied on a New York statute as well as a local rule in denying use of the facilities.

In granting summary judgment, the district court determined that the School District's facilities were "limited public forums," which had not been opened to religious groups by policy or practice. Accordingly, the court concluded that the facilities properly were barred to the plaintiffs in accordance with the New York Education Law and the School District's own Local Rules.

On appeal, appellants contend that the School District, having created public forums by policy and practice, has excluded speech from the forum on the basis of content. This, they urge, is violative of the First Amendment. Appellants also contend that the denial to them of equal access to the School District's facilities, based on the religious content of their speech, is a violation of the Establishment Clause. Finally, they contend that a prior decision of this Court upholding the New York statute that allows the exclusion of religious groups from school district facilities in the absence of a practice of opening the facilities to other religious organizations is erroneous and should not be followed. Finding no merit in any of these contentions, we affirm the judgment of the district court.

## BACKGROUND

By application dated November 19, 1988, Pastor Steigerwald sought the use of rooms in the Center Moriches High School for Lamb's Chapel Sunday morning services and for Sunday School. The hours specified were 9:00 A.M. to 1:00 P.M., and the time period indicated was one year, beginning in December of 1988. The application was made on a form provided by the School District and entitled "Application For Use of School District Facilities." Attached to the application form was a sheet entitled "Rules and Regulations for Community Use of School Facilities." Rule No. 7 was set out as follows: "The school premises shall not be used by any group for religious purposes." Above his signature on the application form, Pastor Steigerwald indicated that he had read the Rules and Regulations and agreed to comply fully with them "excluding #7."

Accompanying the application, and dated November 21, 1988, was a letter to Alice Schoener, School District Clerk, from the Pastor. In the letter, Pastor Steigerwald introduced himself and his Church and noted that their "paramount objective [was] to share the love of Christ in very real and practical ways." He also indicated that he had taken a tour of the Center Moriches High School to "see if the school had adequate facilities for a movie series on the family that will be free of charge and open for the community to attend." Pastor

Steigerwald stated in his letter that he had met with the high school principal, who was concerned that the content of the film be nonsectarian in view of the constitutional requirement for the "separation of church and state." The letter continued: "Those who espouse such a ... view are seriously misinformed. Enclosed you will find several articles that correctly interpret the law that is presently being upheld by the Supreme Court of the United States of America."

By letter dated November 23, 1988 on behalf of the School District, Ms. Schoener advised Pastor Steigerwald that the application "requesting the use of the high school for your Sunday services" was denied, citing Local Rule No. 7 as well as the State Education law. Referring to scheduling problems, Ms. Schoener further advised that she was "very much afraid that, even without the prohibited religious activity aspect, your request would have to be denied." Undeterred, Pastor Steigerwald pressed forward on December 16, 1988 with another application for use of the high school facilities, the second application being limited to one evening per week for five weeks. The hours designated were 7:00 P.M. to 10:00 P.M. and the activity specified was "Family emphasis & Movie presentation by Dr. James Dobson." The purpose set forth was "To open up the film to share some pracital [sic] insights about the family." The facilities requested were the auditorium or gymnasium.

In response to the second application Ms. Schoener wrote to Pastor Steigerwald on January 18, 1989 to request "a more detailed description of your proposed use (including a brochure describing the film)," noting that she was "hard pressed to determine from your description, what the five-part movie would represent" but "suspect[ed] that it would certainly have religious connotations." In the letter requesting additional information, Ms. Schoener observed that "[t]he district has not, in the past, allowed the high school auditorium to be used by any group primarily for its own purposes."

A brochure describing the film, "Turn Your Heart Toward Home," was forwarded by Pastor Steigerwald to Ms. Schoener on February 2, 1989. According to the brochure, the film comes in a 6–part series "every parent should see." In the film, Dr. James Dobson, said to be an expert on family life, "reminds parents of society's slide toward humanism—the undermining influences of radio, television, films and the press—which can only be counterbalanced by a loving home where Christian values are instilled from an early age." In her response dated February 8, 1989, Ms. Schoener advised Pastor Steigerwald as follows: "This film does appear to be church related and therefore your request must be refused." Additionally, Ms. Schoener denied a request made by Pastor Steigerwald on February 2, 1989, for use of the elementary or high school on Friday or Saturday evenings "for 'non-religious purposes' such as volley ball." The reason given was: "We do not schedule outside organizations to use the facilities on Fridays and Saturdays."

Pastor Steigerwald continued to press his petition. On October 11, 1989, he submitted yet another application for the use of Center Moriches School District facilities to show the same film series, described in this application as a "Family oriented movie from a Christian perspective." The stated purpose of Lamb's Chapel was "To invite community of Center Moriches to view this very practical movie for family raising." Once again, the use of an auditorium for five week days over a five-week period was sought. This last application met with a terse response by Ms. Schoener: "This film does appear to be church related and therefore your request must be refused."

The complaint in this action was filed on February 9, 1990 and includes four causes of action: violation of the Freedom of Speech and Assembly Clauses; violation of the Equal Protection Clause; violation of the Free Exercise Clause; and violation of the Establishment Clause. As to each cause, the plaintiffs allege that the defendants' actions were taken under color of state law and in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1983. The

injunctive relief sought was an order permitting plaintiffs the use of the auditorium of the high school or elementary school to show the film series and to allow religious groups use of the facilities without discrimination because of the religious content of their speech. Also sought was a judgment declaratory of plaintiffs' rights to use the facilities in question in accordance with constitutional protections guaranteed by the First and Fourteenth Amendments, including the Free Speech, Freedom of Assembly, Free Exercise, Establishment and Equal Protection Clauses of the Constitution. Plaintiffs also sought a declaration of the unconstitutionality of section 414 of the New York Education Law to the extent it bars the use of school district facilities for purposes of religious speech.

Plaintiffs' motion for a preliminary injunction to compel the School District to allow the use of the District's facilities was denied by the district court in a Memorandum and Order dated May 16, 1990. The court reviewed the facts presented on the motion as well as the applicable legal and constitutional principles and concluded that plaintiffs had "not shown either a substantial likelihood of success on the merits or sufficiently serious questions going to the merits." *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 736 F.Supp. 1247, 1254 (E.D.N.Y.1990). An appeal to this Court from the Order denying the preliminary injunction was withdrawn, and the matter was returned to the district court for further proceedings. Thereafter, the plaintiffs moved for summary judgment and the School District cross-moved for the same relief. After hearing testimony as well as considering exhibits and affidavits, the district court granted the School District's motion and denied the plaintiffs' motion in a Memorandum and Order dated July 15, 1991, giving rise to this appeal.

In granting summary judgment, the district court found "that if the intended use of school facilities is not required or authorized by statute, there is no constitutional right to such use where a school district has not, by policy or practice, permitted a similar use in the past." *Lamb's Chapel v. Center Moriches Union Free School Dist.*,

770 F.Supp. 91, 98 (E.D.N.Y.1991). Although it determined that the Center Moriches School District facilities are limited public forums, the court concluded that the "District ha[d] not, by policy or practice, opened its doors to groups akin to Lamb's Chapel," and therefore held "that the School District's denial of plaintiffs' applications to show the film series [was] viewpoint-neutral and, hence, constitutional." *Id.* at 99. We agree with the conclusion reached by the district court.

## DISCUSSION

According to the Supreme Court, the extent of permissible governmental regulation of expressive activity on publicly owned property is dependent upon the character of the public property in question. *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Court has identified three categories of publicly owned property and has defined what regulatory power, consistent with the First Amendment, may be exercised in each category. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).

The power of the State to regulate expression is most limited in regard to the category of public property designated "traditional public forum." Streets, parks and similar locales, said to "have immemorially been held in trust for the use of the public and [which], time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939), fall within this classification. In such a forum, a regulation providing a content-based exclusion may be enforced only when "necessary to serve a compelling state interest" and must be "narrowly drawn" to serve that purpose. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. Also, narrowly tailored, content-neutral regulations pertaining to the time, place and manner of expression in a traditional

public forum may be enforced, if they "serve a significant government interest, and leave open ample alternative channels of communication." *Id. See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

The second category of public property pertinent to this analysis is made up of property purposefully opened for use by the public for expressive activity. Although government is not required to open this sort of forum or to keep it open indefinitely, the regulation of expression in a locale encompassed within the second category must meet the same standards as are applicable to a traditional public forum. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Places opened specifically for the use of certain speakers or for the discussion of certain subjects are referred to as "limited" or "designated" fora. *See Longo v. U.S. Postal Service*, 953 F.2d 790, 793–94 (2d Cir.1992); *Travis v. Owego–Apalachin School Dist.*, 927 F.2d 688, 692 (2d Cir. 1991). As to these fora, "the first amendment protections provided to traditional public forums only apply to entities of a character similar to those the government admits to the forum." *Calash v. City of Bridgeport*, 788 F.2d 80, 82 (2d Cir.1986).

Least restricted is the power of government to regulate expression in the third category of public property—the non-public forum. Included in this category is property that is not open for communicative purposes either by tradition or designation. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. With respect to such property, where governmental control is analogous to that of a private owner, *see United States Postal Service v. Council of Greenburgh*, 453 U.S. 114, 129–30, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981), a reasonableness standard prevails, *see International Soc'y For Krishna Consciousness v. Lee*, 925 F.2d 576, 580 (2d Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 855, 116 L.Ed.2d 764 (1992). The standard is met when the applicable restrictions "reflect a legitimate government concern and do not suppress expression merely because public officials oppose the speaker's view." *See Paulsen*

*v. County of Nassau*, 925 F.2d 65, 69 (2d Cir.1991).

The Center Moriches School District facilities appellants sought to use do not fall within the categories of "traditional public forum" or "non-public forum," and appellants do not contend that they do. What appellants do contend is that the school authorities in the Center Moriches School District by policy and practice have opened the facilities for the use of the general public and that the exclusion of religious speech is prohibited under the standards governing the second category. *See Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988). An examination of pertinent policy and actual practices, however, convinces us that the school property in question falls within the subcategory of "limited public forum," the classification that allows it to remain non-public except as to specified uses. *See Deeper Life Christian Fellowship v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir.1988) (*Deeper Life I*).

In the matter of School District policy, the District is governed by section 414 of the New York Education Law and its own Local Rule No. 7. Section 414 sets out ten purposes for which the use of schoolhouse facilities may be granted throughout the State of New York: instruction; public library purposes; social, civic and recreational meetings; events for which admission fees are charged, if the fees are to be applied to educational and charitable (but not religious) purposes; elections and political meetings; civic forums and community centers; classes for mentally retarded minors; recreation and athletics; child care services during non-school hours; and graduation exercises held by not-for-profit elementary and secondary schools, provided no religious service is performed. N.Y.Educ.Law § 414[1](a)–(j) (McKinney 1988 & Supp.1992). Religious uses are nowhere permitted in this enumeration. All the uses specified are subject to such regulations as may be adopted by boards of education in the various school districts of the state, but the regulations must not conflict with the state law. *See id.* As previously noted, the Board of Education of

the Center Moriches Union Free School District has provided in its Local Rule No. 7 that "[t]he school premises shall not be used by any group for religious purposes."

In *Deeper Life I* we adopted a state court interpretation of section 414 that the use of New York school facilities is confined to nonreligious purposes, *see Trietley v. Board of Educ.*, 65 A.D.2d 1, 5–6, 409 N.Y.S.2d 912, 915 (4th Dep't 1978), and thereby ascertained the state's intent to create a limited public forum from which religious uses would be excluded. *See Deeper Life I*, 852 F.2d at 680. We determined in that case that under the statute and applicable New York City Board of Education regulations, the School Board had no discretion with respect to the granting of use permits to religious groups. *See Deeper Life Christian Fellowship v. Sobol*, 948 F.2d 79, 83 (2d Cir.1991) (*Deeper Life II*).

Appellants argue, in effect, that once the school district facilities are opened as a public forum for one purpose, they are opened for all purposes. They take issue with our view that "property remains a nonpublic forum as to all unspecified uses ..., and exclusion of uses—even if based upon subject matter or the speaker's identity—need only be reasonable and viewpoint-neutral to pass constitutional muster," *Deeper Life I*, 852 F.2d at 679–80 (citations omitted), and contend that our view does not represent a proper interpretation of Supreme Court precedent. That challenge is barred by the rule of *stare decisis*, not only as a consequence of the *Deeper Life* cases but also as a consequence of our decision in *Travis*, where we held that "in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." 927 F.2d at 692.

In *Travis*, the school district was constrained to open its facilities to a religiously-oriented, fund-raising entertainment event benefitting a pregnancy counselling organization affiliated with an organization that promoted Christian gospel evangelism, having previously opened the facilities to a religious Christmas program involving the collection of toys for needy children. "The Christmas program ... created at least a limited public forum for fund-raisers with religious themes." *Id.* at 693. In *Deeper Life I*, we sustained a preliminary injunction in a case in which a church sought the temporary use of an elementary school building, finding as a fair ground for litigation that "the School Board ha[d] opened this forum to [the church] through a practice of granting permits to use public school facilities to other religious organizations." 852 F.2d at 680. Whether Center Moriches has opened its facilities to religious uses and purposes presents a close question here.

On appeal, appellants principally rely upon three prior uses of school district facilities to demonstrate a prior practice of opening Center Moriches public schools to outside of school religious uses: a Salvation Army Band Benefit Concert; a Gospel Music Concert; and a lecture series entitled "Psychology and the Unknown," given by Jerry Huck. The Band Benefit Concert involved performances by the Center Moriches High School Band as well as the Salvation Army Greater New York Youth Band. The money raised at this concert was used to provide a scholarship for a high school band member and to provide funds for children to go to summer camp. The only religious connotations found in the Joint Band Program were the invocation, the performance of a piece called "Jericho Revisited" and the finale, "God Bless America." Although appellants adduced evidence that "the Salvation Army is a church or a quasi-church," the Joint Band Program hardly can be described as any kind of a religious use of school district property. The theme of the Program was not religious and any reference to religion was incidental at best.

The Gospel Music Concert was performed by a group called the "Southern Harmonizers Gospel Singers." The purpose of the program was to raise money for the school's black student scholarship fund. The program consisted in the main of gospel and spiritual music. The busi-

ness manager of the Singers defined gospel music as "the good news of God." Included in the program were such well-known religious songs as "Amazing Grace!" and "The Lord is my Shepherd" from the Twenty–Third Psalm of the Old Testament. The business manager responded in the affirmative when asked if the concert could be enjoyed for the music itself. Obviously, this is so. Much of the world's greatest music has some religious connotation but can be enjoyed by people of all religious beliefs as well as people of no religious beliefs. The performance by the Southern Harmonizers was not a religious service or event but a musical and cultural one. It took place in a non-religious context and had a non-religious purpose.

The lecture series, "Psychology and The Unknown," by Jerry Huck, was sponsored by the Center Moriches Free Public Library. The library's newsletter characterized Mr. Huck as a psychotherapist who would discuss such topics as parapsychology, transpersonal psychology, physics and metaphysics in his 4–night series of lectures. Mr. Huck testified that he lectured principally on parapsychology, which he defined by "reference to the human unconscious, the mind, the unconscious emotional system or the body system." When asked whether his lecture involved matters of both a spiritual and a scientific nature, Mr. Huck responded: "It was all science. Anything I speak on based on parapsychology, analytic, quantum physicists [sic]." Although some incidental reference to religious matters apparently was made in the lectures, Mr. Huck himself characterized such matters as "a fascinating sideline" and "not the purpose of the [lecture]."

As is apparent from the foregoing, none of the prior uses pointed to by the appellants were for religious purposes. Nor are we able to discern any previous uses of any school district property for religious purposes upon an examination of the record. Incidental references to religion or religious figures, the occasional use of religious terms, and the performance of music with religious overtones do not convert a secular program into a religious one. The programs cited as examples did not carry out religious themes nor were they presented in a religious context. We simply have not been able to identify any prior use of Center Moriches School District facilities for purposes that are religious in any meaningful way. We therefore conclude that the facilities were limited forums not opened to religious uses by policy or practice and that there was no constitutional violation in the failure of the School District to afford access to appellants.

*Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) and *Board of Educ. of the Westside Community Schs. v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), relied upon appellants, do not dictate a contrary result. In *Widmar*, the Court held that a state university could not deny access to university facilities to *students* who wished to conduct religious meetings on campus. *Widmar*, 454 U.S. at 273, 102 S.Ct. at 276. The Court found in that case that "[t]hrough its policy of accommodating their meetings, the University has created a forum generally open for use by student groups," noting that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Id.* at 267 & n. 5, 102 S.Ct. at 273 & n. 5. In *Mergens*, the Court held that the Equal Access Act, 20 U.S.C. § 4071(b) prohibited a high school from "discriminating, based on the content of the students' speech, against students who wish to meet on school premises during noninstructional time." 496 U.S. at 247, 110 S.Ct. at 2370. The high school had created a limited open forum by allowing noncurriculum-related student groups to use the school facilities. The denial of a request to form a Christian club, under the circumstances revealed, constituted a denial of equal access under the Equal Access Act.

Although appellants contend that our *Deeper Life* opinions are incompatible with these Supreme Court decisions and that the decisions compel a reversal of the district court in the case at bar, the contention is baseless. *Widmar* involved the use of university property by student groups in a situation where a number of such groups

had been afforded access, to the point where, as to the students, a "generally open forum" was created. 454 U.S. at 267, 102 S.Ct. at 273. Similarly, in *Mergens,* the religious use of school property was sought by students, who have a greater claim on the use of school property than outsiders, especially when the property generally is open to student groups. The Supreme Court decided *Mergens* purely on statutory grounds, noting that it did not need to decide whether the First Amendment requires the same result. In the *Deeper Life* cases, as in the case at bar, we are presented with outside organizations seeking access where access has been limited and all religious use has been barred by policy and practice.

The appellants argue that denial of access somehow violated the Establishment Clause of the First Amendment as well as the Freedom of Speech Clause. It is difficult to see how this is so. If anything, a claim of a violation of the Free Exercise Clause would be expected. Nevertheless, there is no basis for any claim of First Amendment violation here. We have considered all of the arguments advanced by the appellants and find them meritless.

## CONCLUSION

The judgment of the district court is affirmed in all respects.